*In re* L<span>u</span>is E. G<span>ervitz</span> C<span>arbonell</span>, J<span>orge</span> I<span>zquierdo</span> S<span>an</span> M<span>i</span>-
guel, J<span>osé</span> G. I<span>zquierdo</span> S<span>tella</span>, F<span>rancisco</span> T<span>roncoso</span> y el
B<span>ufete</span> C<span>oale</span>, C<span>ooley</span> <span>and</span> L<span>ietz</span>, querellados.

*Número:* CP-1998-16 *Resuelto:* 28 de julio de 2004

666

*Carlos Lugo Fiol*, procurador general; *Pedro E. Ortiz Álvarez*, abogado de los Lcdos. José G. Izquierdo Stella y Jorge Izquierdo San Miguel, querellados; *Raquel Torres Laureano y Luis Pabón Roca*, abogados del Bufete Coale, Cooley and Lietz, querellado; *Luis E. Gervitz Carbonell*, abogado querellado que comparece por derecho propio; *Luis Mariano Negrón Portillo*, abogado del Lcdo. Luis E. Gervitz Carbonell, querellado; *Guillermo Figueroa Prieto*, abogado del Lcdo. Francisco M. Troncoso, querellado; *Jorge Ortiz Brunett*, abogado querellado que comparece por derecho propio; *Manuel Reyes Dávila y Ramón Antonio Guzmán Rivera*, abogados de Jorge Ortiz Brunett; *Manuel Fermín Arraiza*, presidente del Colegio de Abogados de Puerto Rico; *Enrique Rivera Santana*, comisionado especial.

PER CURIAM:

## I

El 4 de diciembre de 1996 el entonces presidente del Colegio de Abogados de Puerto Rico (Colegio), Lcdo. Fermín Arraiza, nos remitió una copia de un comunicado de prensa que dicha institución circuló a los medios informativos del país. En el referido comunicado, el Colegio expresaba su preocupación por la alegada gestión de algunos abogados para procurarse clientes con el propósito de instar acciones en daños y perjuicios relacionadas con la explosión ocurrida en las inmediaciones del Paseo de Diego en Río Piedras. Además, el comunicado advertía a la clase togada a "alejarse de todo lo que pueda parecer comercio con el dolor y la desventura del prójimo y evitar ... que el ánimo de lucro sea una consideración de primer orden ...".

Mediante Resolución de 12 de diciembre de 1996, este Tribunal ordenó al Procurador General investigar la conducta profesional desplegada por algunos abogados tras la explosión acaecida el 21 de noviembre de 1996. Además, se instruyó al Procurador General a examinar la razonabilidad y legalidad de los contratos de servicios legales suscritos por las víctimas y sus familiares; es decir, evaluar si éstos se otorgaron libre y voluntariamente, sin mediar un aprovechamiento indebido ante el dolor y la magnitud de la tragedia.

El 3 de septiembre de 1997, y tras la investigación de rigor, el Procurador General nos presentó su Informe. Éste señaló que la mayoría de los abogados que ostentan la representación legal de personas perjudicadas por el trágico evento no incurrió en irregularidad o conducta deshonesta en la contratación de sus clientes. No obstante, concluyó que varios abogados y un bufete legal incurrieron en conducta impropia. Entre los señalados estuvieron los querellados en este caso: Luis E. Gervitz Carbonell, Jorge Izquierdo San Miguel, José G. Izquierdo Stella, Jorge Ortiz

Brunet,[1] Francisco Troncoso y el bufete Coale, Cooley and Lietz.

Luego de darle oportunidad a los aquí querellados para que reaccionaran al Informe del Procurador General, ordenamos la presentación de la querella correspondiente.[2] El Procurador General presentó la Querella el 7 de diciembre de 1998. En ella se le imputa a los querellados el cargo siguiente:

> *Los abogados de epígrafe violentaron los principios establecidos por el Canon 34 de Ética Profesional el cual, entre otras cosas, obliga a todo abogado a abstenerse de ofrecer, sin ser requerido su consejo o asesoramiento legal a clientes potenciales para iniciar reclamaciones judiciales, ya sea directamente o a través de intermediarios.* Querella, pág. 2.

Los querellados respondieron al cargo imputado por separado, con excepción de los licenciados Izquierdo Stella e Izquierdo San Miguel, quienes comparecieron conjuntamente. Todos negaron haber incurrido en conducta impropia.

Mediante Resolución de 28 de abril de 1999, designamos al Lcdo. Enrique.Rivera Santana como Comisionado Especial en el caso. A éste se le encomendó oír y recibir la prueba, y emitir un informe con sus conclusiones de hechos y recomendaciones pertinentes.

El 30 de noviembre de 1999 se celebró una conferencia sobre el estado del caso, a la cual comparecieron todas las partes. En esta conferencia, el Procurador General y el querellado Francisco Troncoso acordaron enmendar la querella en cuanto a este último para eliminar el cargo por violación al Canon 34 y sustituirla por una al Canon 38

---

[1] La acción disciplinaria que hoy atendemos incluía originalmente como parte querellada al Lcdo. Jorge Ortiz Brunet. No obstante, el 21 de mayo de 2002 se presentó ante nos una moción de sobreseimiento y archivo del asunto disciplinario respecto a éste, en vista de su fallecimiento el 20 de febrero de 2002. Mediante Resolución de 30 de mayo de 2003, ordenamos el archivo solicitado y la correspondiente enmienda del epígrafe para eliminar el nombre del licenciado Ortiz Brunet.

[2] Dicha orden se emitió mediante Resolución de 30 de octubre de 1998.

(sobre apariencia de conducta profesional impropia), ambos del Código de Ética Profesional, 4 L.P.R.A. Ap. IX. Con este arreglo, el caso de este querellado quedó sometido. En cuanto a los demás querellados, se fijó un término para presentar el Informe sobre la conferencia celebrada y se pautó una vista de seguimiento para el 16 de febrero de 2000.

En la vista de seguimiento, y tras las estipulaciones pertinentes, quedó sometido el caso de los querellados Izquierdo Stella e Izquierdo San Miguel. En cuanto al bufete Coale, Cooley and Lietz, se autorizó una enmienda a la querella para que se imputara adicionalmente el cargo siguiente:

> El bufete Coale, Cooley, Lietz ... violentó los principios estatuidos por el Canon 36 de Ética Profesional, el cual, entre otras cosas, obliga al abogado a evitar en el proceso de anunciarse cualquier tipo de propaganda engañosa o falsa. Informe del Comisionado Especial, págs. 5–6.

Luego de aprobarse el Informe Enmendado, quedó sometido el caso contra ese bufete.

Finalmente, tras los acuerdos alcanzados en una vista celebrada el 10 de mayo de 2000, quedó sometido el caso contra el licenciado Gervitz Carbonell.

Una vez sometidos todos los casos, las partes convinieron no presentar a los testigos (los clientes) en la vista evidenciaria, y optaron en su lugar por presentar las declaraciones juradas de éstos.[3] Se llegó a ese acuerdo ya que las partes consideraron que una vista evidenciaria podría resultar particularmente dañina para las personas que fuesen a declarar. Específicamente, las partes consideraron inapropiado entrar a cuestionar la credibilidad, o plantear contradicciones, de personas que ya habían sufrido

---

[3] Véase Informe del Comisionado Especial, pág. 30. El único querellado que presentó prueba testifical fue el licenciado Gervitz Carbonell, pero ésta se limitó a su propio testimonio, el de su esposa y el de su secretaria.

suficiente a consecuencia de la tragedia que experimentaron.

Así las cosas, el 30 de octubre de 2000 el Comisionado Especial rindió su Informe, tomando en consideración

> ... la totalidad de la amplia prueba documental a base de la cual las partes dejaron los casos sometidos, y ponderada también la prueba oral presentada en cuanto al querellado Gervitz Carbonell. Informe del Comisionado Especial, pág. 6.

Veamos a continuación los hechos específicos imputados a cada querellado, según lo informado por las partes, y las determinaciones fácticas del Comisionado Especial.

## II

### A. *Lcdo. Luis E. Gervitz Carbonell*

El 21 de noviembre de 1996 ocurrió una explosión en el edificio multipisos donde ubicaba la tienda Humberto Vidal, el cual estaba localizado en el área del Paseo de Diego en Río Piedras, Puerto Rico. Dicha explosión destruyó el mencionado edificio, además de causar decenas de muertos y serios daños a personas y edificios.

Entre las personas que fallecieron en la tragedia se encontró la Sra. Maritza Ramos Rivera, a quien se le dio cristiana sepultura el 24 de noviembre de 1996. La señora Ramos Rivera era hija de Doña Justina Rivera del Moral.

El 25 de noviembre de 1996, en horas de la mañana, alguien (el Comisionado Especial expresó que la prueba presentada no le permitió establecer la identidad de la persona) se comunicó vía telefónica con la señora Rivera del Moral, identificándose como la esposa del licenciado Gervitz Carbonell e indicándole que dicho abogado estaba en disposición de ayudarla. La señora Rivera del Moral le respondió que en esos momentos no estaba en gestiones de contratar abogado.

La prueba presentada evidenció que el licenciado Gervitz Carbonell no estuvo esa mañana en su oficina. No obs-

tante, el Comisionado Especial determinó que la llamada telefónica en cuestión se originó desde la oficinas del licenciado Gervitz Cabonell, y que se dejó un mensaje anotado para que el abogado se comunicara más tarde con la señora Rivera del Moral en relación con "el caso de [la] explosión". Dicha anotación se hizo en la libreta que servía de registro de llamadas del abogado. Sin embargo, no se pudo evidenciar quién tomó la llamada debido a que, según el querellado, la práctica de la oficina era la de no firmar al anotar los mensajes. Tampoco se preservó el registro, por lo que no estuvo disponible a la fecha de la vista evidenciaria.

El Comisionado Especial concluyó, además, que en la tarde del 25 de noviembre de 1996, la secretaria del licenciado Gervitz Carbonell pasó a éste las notas sobre las llamadas de la mañana, una de las cuales era la de la señora Rivera del Moral. La secretaria procedió a llamar a ésta última y luego la comunicó con el abogado. El licenciado Gervitz se identificó como vicepresidente del Colegio de Abogados —lo que efectivamente era para esa fecha— y se ofreció a ayudarle. Ella reiteró que no estaba interesada. En su declaración jurada, la señora Rivera de Moral indicó que durante la comunicación en cuestión el licenciado Gervitz Carbonell "no insistió en contratarla" para instar una acción de daños y perjuicios, y que ella no se sintió "presionada". Sin embargo, la señora Rivera del Moral declaró que sí inquirió al querellado sobre cómo encontró su número de teléfono, a lo que el letrado no respondió.[4]

Luego de su comunicación con el licenciado Gervitz Carbonell, la señora Rivera del Moral le mencionó lo ocurrido a un familiar suyo, el Lcdo. Enrique Juliá. Éste le sugirió que hiciera una declaración jurada de lo ocurrido, ya que el Colegio de Abogados estaba investigando la conducta de algunos abogados en relación con la explosión de Río

---

[4] El Comisionado Especial expresó en su Informe que el teléfono aparecía listado en la guía telefónica a nombre de la hija fallecida, Sra. Maritza Ramos Rivera.

Piedras. La señora Rivera del Moral procedió de conformidad y, posteriormente, contrató a otro abogado para que la representara en su reclamación por los daños sufridos a causa de la muerte de su hija.

Para el 25 de noviembre de 1996, el bufete del licenciado Gervitz Carbonell —Gervitz & Barrios— ya tenía un contrato de servicios profesionales para representar a otro reclamante relacionado con la explosión, el Sr. Diano Fernández, a quien el querellado no conocía. Ese cliente obtuvo el número de teléfono del bufete a través de un vínculo que tenía con las Empresas Santana, cuyo presidente tenía, a su vez, buenas relaciones con el socio del querellado, el Lcdo. Renato Barrios. El Comisionado Especial concluyó que el bufete del licenciado Gervitz Carbonell obtuvo la representación del señor Fernández a través del licenciado Barrios.

Mediante una moción de 28 de noviembre de 2000, el licenciado Gervitz Carbonell ripostó al Informe del Comisionado Especial. Alegó que no existe prueba para concluir que la llamada a la señora Rivera del Moral se originara desde sus oficinas, mucho menos a instancias de él. Señaló también que durante la mañana del 25 de noviembre de 1996, ni él, ni su esposa, ni su secretaria, estuvieron presentes en la oficina en horas de la mañana. Así adujo que lo único que puede determinarse de la prueba desfilada es que, una vez él llegó a su oficina, llamó a la señora Rivera del Moral ya que, conforme a la libreta de mensajes, se le requería hacerlo.

B. *Licenciados Izquierdo Stella e Izquierdo San Miguel*([5])
 1. *Caso Maritza Ramos Rivera*
La Sra. Maritza Ramos Rivera (véase la relación de hechos del caso del licenciado Gervitz Carbonell) era esposa del Sr. Rafael Rodríguez y madre de las niñas A., J. y K.

---

([5]) En vista de que estos abogados contestaron la querella de manera conjunta, resolvemos los señalamientos en contra de éstos de igual manera.

Rodríguez Rivera. Los padres del señor Rodríguez, abuelos paternos de las hijas de la señora Ramos Rivera, son el Sr. Jorge Ayala y la Sra. Inarvis Aponte.

A raíz de la muerte de la señora Ramos Rivera, la Sra. Justina Rivera del Moral (madre de ésta) retuvo a las tres hijas de la finada (sus nietas). Ante la preocupación de que hubiese un reclamo por la custodia de las niñas de parte de la señora Rivera del Moral, Doña Inarvis Aponte (madre del Sr. Rafael Rodríguez, quien es el padre de las niñas y viudo de la señora Ramos Rivera) se comunicó con el licenciado Izquierdo Stella, a quien conocía desde hace alrededor de veinte años, para que fuera a la funeraria y la orientara.

El licenciado Izquierdo Stella —a quien la Sra. Inarvis Aponte se refiere en su declaración jurada como "Pincho"— visitó la funeraria y un día después fue a la residencia de ésta. El querellado Izquierdo Stella orientó a la señora Aponte y al Sr. Rafael Rodríguez sobre aspectos relacionados a la custodia de las niñas, así como sobre la posibilidad de entablar una demanda de daños y perjuicios por la muerte de la señora Ramos Rivera. Tras la orientación, éstos autorizaron al licenciado Izquierdo Stella a presentar una acción de daños a nombre de toda la familia, y a representarlos en cualquier caso que se presentara relacionado con la custodia de las niñas. El querellado se ofreció a llevar el caso de custodia *pro bono*.

Posteriormente, la señora Rivera del Moral presentó ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una petición reclamando la custodia de sus tres nietas.[6] El caso se tornó contencioso y los licenciados Izquierdo Stella e Izquierdo San Miguel asumieron la representación del padre de las niñas, el Sr. Rafael Rodríguez. La señora Rivera del Moral estuvo representada por el Lcdo. Enrique Juliá.

Por razón de la relación surgida entre el licenciado Iz-

---

[6] Caso Civil Núm. KCU 96-160.

quierdo Stella y la familia de Doña Inarvis Aponte, el primero visita con frecuencia a estos clientes. Surge de autos que a veces juegan dominó, que el abogado le prestó a la familia una casa que posee en Cabo Rojo para que éstos pasaran un fin de semana, y que éste "le da la mano" en la transportación de las niñas a la escuela.

### 2. Caso Omayra de León Flores

En la explosión del edificio Humberto Vidal también falleció la Sra. Omayra de León Flores, hija de doña Ana Delia Flores y de don Eugenio De León. La occisa fue sepultada el 27 de noviembre de 1996.

Para la fecha de la tragedia, la Sra. Norma Sánchez se desempeñaba como funcionaria de orientación de la *Federal Emergency Management Agency* (FEMA, por sus siglas en inglés). A raíz de la explosión, ésta fue enviada por dicha agencia federal a la zona del desastre, para que ofreciera orientación y apoyo a los afectados por el evento. Se estipuló que la señora Sánchez —quien también fue destacada de la Cruz Roja Americana— conocía al licenciado Izquierdo Stella por muchos años.

Mientras desempeñaba sus labores de orientación en el área de la explosión, la señora Sánchez se relacionó con la Sra. Janet De León, hermana de la finada Omayra de León. En la conversación, Janet le expresó a la señora Sánchez la preocupación de sus padres respecto al futuro de su nieto (el hijo de la occisa Omayra De León). Como resultado de la conversación, acordaron visitar a la Sra. Ana Delia Flores (madre de la finada y de Janet De León). Así pues, el 1 de diciembre de 1996 la señora Sánchez visitó la residencia de la Sra. Ana Delia Flores, acompañada del licenciado Izquierdo San Miguel.

Durante la conversación sostenida en la residencia de la Sra. Ana Delia Flores, el licenciado Izquierdo San Miguel pidió a ésta que suscribiera unos documentos que alegadamente eran necesarios para atender los asuntos de su nieto con ciertas agencias gubernamentales (Seguro Social y el

Fondo del Seguro del Estado, entre otras). La señora Flores se rehusó al principio, pero ante la insistencia del licenciado Izquierdo San Miguel (quien le aseguró que era para poder ayudar a su nieto) ella accedió a firmar, sin examinar el documento. Sin embargo, el esposo de la señora Flores, Sr. Eugenio De León, se negó a firmar, por lo que su esposa firmó por él. No se le entregó a los firmantes en ese momento copia del documento.

Desde antes del entierro de su hija Omayra, sin embargo, el matrimonio De León-Flores había pedido al Lcdo. Carlos Mondríguez que los orientara en cuanto al futuro de su nieto (hijo de Omayra). Ese abogado accedió a entrevistarlos, y les dio una cita para el 7 de diciembre de 1996. No obstante, el 6 de diciembre de 1996 los esposos De León-Flores recibieron en su residencia un sobre proveniente de las oficinas de los licenciados Izquierdo, el cual llevaron consigo el próximo día a la oficina del licenciado Mondríguez. Cuando éste examinó los documentos que obraban en el sobre, se percató de que se trataba de una copia de un contrato de servicios profesionales y de una copia de una demanda de daños y perjuicios presentada por los licenciados Izquierdo a nombre de la señora Flores, su esposo y tres hijos de ese matrimonio. *Ninguno de los demandantes había autorizado a que se presentara una demanda a su nombre.*

Posteriormente, durante la mañana del domingo 8 de diciembre de 1996, se presentaron los licenciados Izquierdo a la residencia de los esposos de León-Flores. De inmediato, el señor de León acusó a los abogados querellados de haber forzado a su esposa a firmar los documentos sin leerlos y sin haberle explicado que se trataba de un contrato de servicios profesionales. Les expresó, además, que ellos ya tenían abogado (el licenciado Mondríguez), a lo cual éstos replicaron que no había reparo en que éste se uniera a la representación legal. Asimismo, los licenciados Izquierdo le señalaron a los esposos De León-Flores que sólo habían

ido a obsequiarles un libro. Éstos le reiteraron que no les interesaba que ellos los representaran.

Varios días después, el licenciado Mondríguez fue invitado al programa radial del periodista Luis Francisco Ojeda. En éste se dialogó sobre la conducta de algunos abogados relacionada a la gestión de allegarse clientes afectados por la tragedia de Río Piedras. El día después a la transmisión de ese programa radial, el licenciado Izquierdo Stella se trasladó hasta el lugar de trabajo del señor De León y le solicitó que firmara una carta que llevaba preparada. El señor de León se negó a firmarla, a lo que el licenciado Izquierdo Stella contestó que entonces iba a tener que suicidarse.

Luego de ese incidente, los esposos De León-Flores recibieron varias llamadas del licenciado Izquierdo Stella, urgiéndolos a que firmaran otros documentos. Surge del Informe del Comisionado Especial que dichos documentos no están entre los estipulados, y que tampoco fueron unidos en autos.

3. *Caso Claudia Pabón*

Otra de las víctimas de la explosión de Río Piedras fue la Sra. Claudia Pabón, quien a la fecha de la tragedia estaba casada con el Sr. Miguel Carrillo Rosado. Mientras el cuerpo de su difunta esposa era "velado" en la funeraria, el señor Carrillo recibió la visita del Lcdo. Eduardo González, quien le ofreció los servicios legales del bufete de los licenciados Izquierdo. El señor Carrillo expresó que, al momento de la visita, desconocía quién le había suministrado su nombre a dicho bufete, cosa que el licenciado González tampoco le explicó.[7]

No obstante, el señor Carrillo aceptó ser orientado por el bufete del licenciado Izquierdo Stella. Dicha orientación

---

[7] Posteriormente, el señor Carrillo se retractó y señaló mediante declaración jurada que advino en contacto con ese bufete a través de su amigo, el Sr. Ángel O'Neill. Este último le ofreció al señor Carrillo hablarle de su caso al licenciado Izquierdo Stella, a lo que éste accedió.

se llevó a cabo, según el señor Carrillo, en la "residencia del Lcdo. Pincho Izquierdo", a donde acudió acompañado de su cuñado y otros familiares. Expresó que no fue presionado para que contratara con el bufete de éste y que, de hecho, escogieron a otro abogado (Lcdo. Francisco Troncoso) para que los representara.

### 4. *Caso Lourdes Yadira Ocasio*

La Sra. Lourdes Yadira Ocasio fue otra de las personas que perdió la vida a consecuencia de la explosión ocurrida en el Paseo De Diego. Ésta era esposa del Sr. Julio César Suárez García.

El señor Suárez García advino en contacto con el bufete de los licenciados Izquierdo a través de la Sra. Norma Sánchez, la empleada de FEMA a la cual nos referimos en el apartado 2 de esta sección. La recomendación vino a través de la madre del señor Suárez García, quien tras ser orientada por la señora Sánchez, le expresó a ésta que "trajera al Lcdo. Izquierdo a su casa". Así pues, el licenciado Izquierdo San Miguel y la señora Sánchez acudieron a la residencia de los padres del señor Suárez. Allí, el licenciado Izquierdo San Miguel y el señor Suárez dialogaron sobre el caso, acordando presentar una demanda en daños y perjuicios. El señor Suárez expresó mediante declaración jurada que se siente muy satisfecho con la representación que los licenciados Izquierdo le han ofrecido.

### 5. *Caso Evelyn Fernández*

Aproximadamente tres semanas luego de la tragedia, el licenciado Izquierdo San Miguel visitó el hogar de la Sra. Evelyn Fernández, quien perdió en la explosión de Río Piedras a su tía, la Sra. María Llanos Canales. De acuerdo con las declaraciones de la señora Fernández, el licenciado Izquierdo San Miguel se presentó en su casa indicando que la Cruz Roja le había entregado una lista de clientes potenciales relacionados con la explosión. La señora Fernández, sin embargo, le expresó al abogado que no estaba interesada en sus servicios. El Informe del Comisionado

Especial concluyó que, ante la negativa de ésta, el querellado se marchó de su residencia y no regresó.

De otra parte, la señora Fernández señaló en su declaración jurada que la Sra. Norma Sánchez visitó la residencia de su madre, hermana de la occisa, y que en dicha ocasión ésta fue acompañada de su esposo y de un trabajador social. En esa conversación, la señora Sánchez recomendó los servicios de los licenciados Izquierdo.

A raíz de los cinco casos relatados en esta sección, el 19 de abril de 2000 se presentó ante nos un escrito titulado Informe Conjunto del Procurador General y de los Querellados José Izquierdo Stella y Jorge Izquierdo San Miguel. En la pág. 1 de dicho Informe los querellados aceptaron que

> ... en el curso de la contratación con algunos clientes pudieron haber hecho expresiones que fueron interpretadas negativamente por algunas personas y que de alguna forma afectaron su percepción del proceso.

De acuerdo con ello, se allanaron a una censura de parte de este Tribunal.

## C. *Lcdo. Francisco Troncoso*

Según la prueba estipulada por las partes, el Lcdo. Francisco Troncoso es un abogado de vasta experiencia en casos de "grandes desastres". Se estipuló también que este querellado representó a varios reclamantes en el caso del Hotel Dupont Plaza y que fue designado como miembro del Comité Timón de abogados que estableció el Tribunal de Estados Unidos para el Distrito de Puerto Rico, para coordinar las reclamaciones que se instaron en dicho foro a consecuencia del fuego ocurrido en esa hospedería. Además, se estipuló que la participación del licenciado Troncoso en ese litigio fue objeto de cobertura en los medios noticiosos del país.

El Comisionado Especial concluyó que, luego de la aludida explosión del 21 de noviembre de 1996, varios perio-

distas que conocían al licenciado Troncoso se comunicaron con él, a propósito de que opinara sobre el litigio que podía surgir como consecuencia de la tragedia. Su opinión fue, en efecto, utilizada por varios periodistas en sus reportajes, y su nombre fue citado como abogado de experiencia en esa clase de litigio. Así, por ejemplo, el periódico *The San Juan Star* de 22 de noviembre de 1996 singularizó al querellado como miembro del comité timón en el caso de Dupont Plaza. *El Nuevo Día* de 23 de noviembre de 1996 también se refirió a éste como abogado con experiencia en el caso del Dupont Plaza. *El Vocero de Puerto Rico*, por su parte, informó el 25 de noviembre de 1996, que los licenciados Troncoso, Ortiz Brunet y Wendell Gautier preparaban reclamaciones millonarias por daños y que ya, tres días antes, el licenciado Ortiz Brunet había presentado la primera demanda.

En cuanto a los medios televisivos, el 25 de noviembre de 1996 los noticiarios de los canales 4, 6 y 11 dieron constancia de la presencia de los licenciados Troncoso y Ortiz Brunet en la escena de la explosión, y aclararon que el Superintendente de la Policía, Lcdo. Pedro Toledo Dávila, no les permitió entrar. Surge del expediente, además, que el licenciado Troncoso fue invitado, junto al licenciado Ortiz Brunet, al programa de televisión "Al Grano", que produce el Sr. Pedro Zervigón, y que se transmitió el 1 de diciembre de 1996. En dicho programa, al enfrentársele con la alegada insensibilidad de los abogados por estar presentando demandas cuando aún se estaban rescatando cadáveres, éste, además de expresarse sobre los términos prescriptivos de las acciones torticeras, hizo mención de que a las víctimas no se les permite estar presentes en la investigación que llevaban a cabo las autoridades federales y estatales. Adujo que, por ello, existía la necesidad de formar un equipo de abogados que estuviesen dispuestos a involucrarse de lleno en el caso. Al inquirírsele sobre cómo se sentía sobre las críticas que se le hacía por la premura

en presentar demandas, éste destacó que los cánones del Código de Ética Profesional le imponen al abogado la responsabilidad de ser diligente, y que ello en este caso suponía que no se quedara sentado esperando que las autoridades pertinentes terminaran su informe.

Finalmente, las partes estipularon que cuando comenzó la exposición noticiosa del licenciado Troncoso, ya éste ostentaba la representación legal de varios clientes. Además, se estipuló que varios abogados refirieron clientes al licenciado Troncoso, entre éstos: Lcdo. Leroy Lewis, Lcdo. Elí B. Arroyo, Lcdo. José A. Acosta Grubb, Lcdo. Enrique Rebollo Portela, Lcdo. Arnaldo L. Fernandini, Lcdo. Iván Durant Sierra, Lcdo. Josué Rodríguez y Lcdo. Luis R. Santini Gaudier.

Como resultado de los hechos y estipulaciones precedentes, las partes acordaron enmendar la querella contra este abogado para que el cargo fuese por violación al citado Canon 38 del Código de Ética Profesional (apariencia de conducta impropia) en lugar del formulado originalmente (Canon 34, *supra*). Posteriormente, el licenciado Troncoso compareció para alegar la vaguedad del término "apariencia de conducta impropia" y la consiguiente imposibilidad de que se le sancione a base de ese estándar.

D. *Bufete Coale, Cooley and Lietz*

El bufete querellado tiene su sede en Washington, D.C., Estados Unidos de América, y se especializa en litigación compleja, incluso en casos de accidentes de aviación y de daños a gran escala (*mass torts*).[8] Según el Informe del Comisionado Especial, conforme al *Martindale-Hubble Directory*, edición de 1996, este bufete está clasificado con un

---

[8] Este bufete operaba originalmente bajo el nombre de Coale y Van Sustern. Posteriormente cambió su nombre a Coale, Cooley, Lietz McInery Broadus, lo cual hace de esta firma la sucesora de la otra para todos los efectos legales.

*Legal Ability Rating* de "A".[9] Informe del Comisionado Especial, pág. 26.

A raíz de la tragedia ocurrida en Río Piedras, el bufete querellado preparó una carta para las familias afectadas. La carta se redactó originalmente en inglés, pero fue traducida al español mediante un programa de computadoras con el texto siguiente:[10]

Querida familia superviviente:

Nuestro más sentido pésame por la pérdida que sufrió su familia como resultado de la explosión de gas Enron.

Somos un bufete nacional e internacional con base en los Estados Unidos, con sede en Washington, D.C., y una de las firmas más prestigiosas para casos de incendios y explosiones. Como tal, estamos en una situación privilegiada para poder proporcionarle una excelente representación legal, y la máxima compensación posible.

Si bien muchos bufetes de los Estados Unidos y Puerto Rico participaron en el último desastre de tal magnitud en Puerto Rico (el incendio del Hotel Dupont Plaza), fuimos nosotros el único bufete que en última instancia llevó el caso a juicio. Sería un honor tener la oportunidad de hacer lo mismo por usted.

Las leyes estatales conocidas como leyes de homicidio culposo y daños personales conceden a las víctimas dañadas y las familias supervivientes el derecho a una indemnización económica. Usamos estas leyes para su beneficio, para maximizar su reclamación.

Mientras que muchos bufetes afirman que pueden manejar su caso, muy pocos tienen el tiempo y los recursos financieros para llevar un caso como éste hasta sus últimas consecuencias—para maximizar la reclamación económica y para dejar

---

[9] Los índices del directorio de Martindale-Hubble clasifican a los bufetes como: "A" (*from Very High to Preeminent*), "B" (*from High to Very High*), "C" (*from Fair to High*). Según dicho directorio, las clasificaciones se basan en:

"the standard of ability for the place or area where the lawyer practices, it also takes into consideration experience, nature of practice and qualifications relevant to the profession. Where a lawyer's practice is limited or specialized, rating opinions are made on the basis of performance in those Fields of Law. There are no minimum periods of time required for any rating."

[10] La carta tenía fecha de 30 de noviembre de 1996.

claro el mensaje a Enron de que la negligencia no se tolerará bajo circunstancia alguna.

Esta ha sido una terrible tragedia, y algo que podría haberse evitado. No podemos hacer nada para cambiar los acontecimientos que han tenido como resultado su pérdida y la de sus seres queridos. Lo que podemos hacer es proporcionar una seguridad financiera definitiva para su familia. Informe del Comisionado Especial, pág. 27.

Esta carta fue entregada personalmente a algunas personas afectadas por el evento trágico de Río Piedras. La entrega la efectuó el Sr. Ted Dickinson y la Sra. Ricci Marcano, a nombre del bufete querellado. En ocasiones, la entrega de la carta fue acompañada de flores y dulces. Ningún abogado del bufete —ni ningún otro abogado— participó de la entrega de la referida carta.

De acuerdo con el Informe del Comisionado Especial, el único caso relacionado con la tragedia en que el bufete asumió la representación legal fue en el de la Sra. Yolanda Santiago Hernández.[11] Posteriormente, cuando dicho bufete se enteró de que la señora Santiago Hernández le había informado al Procurador General que contrató a Coale, Cooley and Lietz porque éstos "insistían en visitarle", le remitió una carta a ésta indicándole que no podía continuar representándola, y la orientó para que gestionara nueva representación legal. La señora Santiago Hernández contestó a dicha misiva urgiéndole al bufete que continuara representándola, e indicándole que se sentía complacida y satisfecha con los servicios que le habían prestado.

### E. *Observaciones del Comisionado Especial*

Tras relacionar lo hechos pertinentes a cada querellado, el Comisionado Especial señaló que la conducta profesional

---

[11] El caso fue presentado ante el Tribunal de Estados Unidos para el Distrito de Puerto Rico, bajo el epígrafe *Yolanda Santiago Hernández v. Enron*, 96-2561CCC. A la señora Santiago Hernández se le identifica en el Informe del Procurador General como la abuela del menor B. Santiago, quien recibió gran exposición en la prensa debido a su corta edad y a los daños que sufrió.

de los querellados bordea, en algunos casos, la frontera entre la violación ética y la protección constitucional a la libertad de expresión.

En cuanto a los licenciados Izquierdo Stella e Izquierdo San Miguel, el Comisionado Especial apuntó a que los dos querellados se beneficiaron de una relación de amistad que tenían con una funcionaria de FEMA que laboraba ofreciendo orientación a las víctimas de la tragedia. Además, señaló como particularmente problemático el caso de la finada Omayra De León Flores, en el cual los querellados indujeron dolosamente a la madre de ésta, la Sra. Ana Delia Flores, a firmar un documento que resultó ser un contrato de servicios profesionales y que ella entendía que tenía un propósito distinto.

En cuanto al Lcdo. Francisco Troncoso, el Comisionado Especial se limita a repasar los hechos imputados a éste, para luego concluir sucintamente que

> [e]xcepto por la participación en la conferencia de prensa que se ofreció en la tarde del 25 de noviembre de 1996, en las demás referencias noticiosas en las que se alude al Lcdo. Troncoso no surge que la información emanara por iniciativa del abogado. Informe del Comisionado Especial, pág. 32.

El Informe del Comisionado Especial no hace observaciones sobre los restantes querellados.([12]) Tampoco recomienda qué tipo de sanción, si alguna, debe ser aplicada a los querellados.

Recibido el Informe del Comisionado Especial, evaluada la prueba documental y teniendo todos los elementos de juicio para resolver, procedemos a hacerlo.

## III

En repetidas ocasiones hemos establecido que todo asunto relacionado con la reglamentación del ejercicio

---

([12]) El Informe también hace observaciones en cuanto al querellado Jorge Ortiz Brunet, quien ya no es parte en este caso por razón de su fallecimiento. Véase esc. 1.

de la profesión legal —como la admisión o la separación de sus miembros— es facultad inherente de este Tribunal. *In re Peña Peña*, 153 D.P.R. 642 (2001); *In re Freytes Mont*, 117 D.P.R 11 (1986); *In re Liceaga*, 82 D.P.R. 252 (1961). Cuando ha sido necesario, hemos ejecutado tal autoridad para separar del ejercicio de la profesión legal a aquellos abogados que no se desempeñan conforme a las rigurosas normas de conducta que rigen su quehacer profesional.

◼ Como regla general, los cánones del Código de Ética Profesional establecen las pautas mínimas que deben guiar a los miembros de la clase togada en el ejercicio de su delicada faena. *In re Ortiz Brunet*, 152 D.P.R. 542 (2000); *In re Filardi Guzmán*, 144 D.P.R. 710 (1998). Su finalidad es promover un desempeño profesional y personal acorde con los más altos principios de conducta decorosa, ello para beneficio tanto de la profesión como de la ciudadanía y las instituciones de justicia del país. *In re Ortiz Brunet*, supra.

En el caso de marras, se le imputa a los querellados haber incurrido en conducta violatoria de varios de estos cánones. Delineamos, pues, el estado de derecho vigente en relación con los cargos imputados.

El Canon 34 del Código de Ética Profesional, *supra*, dispone, en lo pertinente, que:

> Actúa contrario a los altos postulados de la profesión el abogado que, con propósito de lucro y sin ser requerido para que ofrezca su consejo o asesoramiento legal, aliente o estimule, en alguna forma, a clientes potenciales para que inicien reclamaciones judiciales o de cualquier otra índole. Es también contrario a la sana práctica de la profesión el que un abogado, sin ser requerido, bien lo haga personalmente o a través de personas, investigue o rebusque defectos en títulos u otras posibles fuentes o causas de reclamaciones a los fines de beneficiarse en alguna forma mediante la prestación de sus servicios profesionales.
>
> *Empaña la integridad y el prestigio de la profesión y es altamente reprobable el que un abogado, actuando directamente o a través de intermediarios o agentes, haga gestiones para*

*proporcionarse casos o reclamaciones en que intervenir o para proporcionarlos a otros abogados.* Incurre en igual falta el abogado que dé u ofrezca beneficios, favores o compensación de clase alguna a empleados públicos, ajustadores de seguros u otras terceras personas con el fin de ganarse su favor para el referimiento de asuntos que puedan dar base a reclamaciones o casos y, por ende, proporcionarle al abogado aumento en su clientela. (Énfasis suplido.)

Como se puede observar, el citado canon tiene como propósito prohibir la solicitación de clientes de forma personal o a través de intermediarios. La adopción de este canon responde, de una parte, a la histórica animadversión de la profesión legal hacia la conducta de abogados que instigan pleitos judiciales a base de un interés puramente pecuniario. Asimismo, responde a la repulsión que generan las actuaciones de abogados enfocadas en gestionar la contratación de clientes en momentos en que éstos se encuentran en una situación angustiosa o apesadumbrada. Véase *In re Ortiz Brunet* supra.

De otra parte, inspira al texto de este canon la idea de que la contratación de representación legal debe darse de forma libre, inteligente y voluntaria, sin que medien persuasiones o presiones directas e indebidas de parte del abogado. Véase *In re Izquierdo Stella*, 154 D.P.R. 732 (2001). Dado que la contratación debe surgir del genuino convencimiento del cliente de que su reclamación será atendida diligentemente por el abogado que seleccionó, el canon repudia la representación legal obtenida mediante falsas representaciones, medias verdades y engaños. *In re Franco Rivera y Masini Soler*, 134 D.P.R. 823 (1993).

La normativa que precede, sin embargo, tiene que aplicarse a la luz de los pronunciamientos constitucionales que sobre el asunto ha emitido el Tribunal Supremo de Estados Unidos. Desde *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977), los anuncios publicitarios de abogados que no sean falsos, engañosos o que induzcan a error, están protegidos por la Primera Enmienda de la Constitución fe-

deral, ya que se considera "expresión comercial".[13] No obstante, en *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447 (1978), ese Alto Foro resolvió que una entidad estatal encargada de reglamentar la profesión legal puede, constitucionalmente, disciplinar a un abogado que *solicita personalmente* la representación legal de un cliente potencial.

■ Posteriormente, dicho Tribunal resolvió el caso *Shapero v. Kentucky Bar Assn.*, 486 U.S. 466 (1988), en el cual estableció, al amparo de la Primera Enmienda, la validez de las cartas de solicitación no engañosas a personas específicas que el abogado sabe que tienen una potencial reclamación judicial (*targeted mailing*). Al distinguir la situación ante su atención de la solicitación personal vedada en *Ohralik v. Ohio State Bar Assn.*, supra, el Tribunal Supremo de Estados Unidos se expresó en los términos siguientes:

> Like print advertising, petitioner's letter —and targeted, direct-mail solicitation generally— "poses much less risk of overreaching or undue influence" than does in-person solicitation. Neither mode of written communication involves "the coercive force of the personal presence of a trained advocate" or the "pressure on the potential client for an immediate yes-or-no answer to the offer of representation". Unlike the potential client with a badgering advocate breathing down his neck, the recipient of a letter and the "reader of an advertisement ... can 'effectively avoid further bombardement of [his] sensibilities simply by averting [his] eyes' ". A letter, like a printed advertisement (but unlike a lawyer), can readily be put in a drawer to be considered later, ignored, or discarded. (Énfasis suplido y citas omitidas.) *Shapero v. Kentucky Bar Assn.*, supra, págs. 475–476.

■ La jurisprudencia citada nos obliga por imperativo de la Primera Enmienda, ya que cuando se trata de derechos fundamentales, en nuestra jurisdicción tenemos que observar las garantías mínimas reconocidas bajo la

---

[13] Sobre la "expresión comercial", véanse: *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557 (1980); *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748 (1976).

Constitución de Estados Unidos. *López Vives v. Policía de P.R.*, 118 D.P.R. 219 (1987). Por lo tanto, bajo el Canon 34 del Código de Ética Profesional, *supra* la solicitación a personas específicas mediante cartas no engañosas está permitida constitucionalmente. La solicitación personal,[14] por el contrario, no está permitida porque constituye una intromisión con la intimidad de la persona y una presión indebida en el proceso de selección de abogado, que debe ser inteligente, libre y voluntario.

Por otro lado, el Canon 38 del Código de Ética Profesional, *supra* dispone, en lo pertinente, que

> [e]l abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia.

En *In re Ortiz Brunet* supra, pág. 556, expresamos que cada abogado es un espejo en el que se refleja la imagen de la profesión. Ello es así, ya que sus actuaciones manifiestan ante la comunidad las bases del concepto que ésta se forme, no solamente del abogado en particular, sino también de la clase togada en general. Por ello, resolvimos en ese caso que la

> ... inmediatez de la presencia de los abogados ... en momentos de indudable angustia de los familiares de una víctima, siembra serias dudas sobre la conducta profesional de los miembros de la profesión. Íd.

Asimismo, en *In re Izquierdo Stella*, supra, pág. 740, expresamos que

> [e]s responsabilidad de los abogados examinar con rigor y prudencia los escenarios en los que pudieran desenvolverse, de forma tal que eviten incurrir, o aparentar que incurren en

---

[14] Se ha reconocido, además, como "contacto personal" la llamada telefónica no grabada. Regla Modelo 7.3 de la American Bar Association (ABA). Dicha Regla Modelo, según revisada por la Comisión *Ethics 2000* se refiere también a la comunicación electrónica en vivo (*Chats*) como una forma de contacto personal prohibido.

conducta éticamente censurable y nociva a la dignidad y honor de la profesión.

 Finalmente, en cuanto a las penalidades correspondientes a un abogado que incurre en conducta impropia, hemos establecido que en la determinación de la sanción aplicable, este Tribunal tomará en consideración factores tales como el previo historial del abogado, si se trata de una primera falta o de una conducta aislada, y si el abogado goza de buena reputación en la comunidad. *In re Vera Vélez*, 160 D.P.R. 479 (2003); *In re Rivera Arvelo y Ortiz Velázquez*, 132 D.P.R. 840 (1993).

A base del estado de Derecho delineado en esta sección, resolvemos.

## IV

### A. *Lcdo. Luis E. Gervitz Carbonell*

El Comisionado Especial encontró probado que, durante la mañana del 25 de noviembre de 1996, alguien se comunicó con la Sra. Justina Rivera del Moral, madre de la finada Maritza Ramos Rivera, para ofrecerle los servicios del Lcdo. Luis E. Gervitz Carbonell. Dicha comunicación, determinó el Comisionado Especial, no fue solicitada, gestionada o aprobada con anterioridad por la recipiente de ésta. Asimismo, dicho funcionario concluyó que, a pesar de que la identidad de la persona que hizo la llamada no pudo determinarse, ésta se originó desde las oficinas del licenciado Gervitz Carbonell.

El querellado, por su parte, alegó que no hay prueba para concluir que la llamada realizada esa mañana se realizó desde su oficina o que la realizara su esposa, su secretaria o él personalmente. Sin embargo, aceptó que llamó a la señora Rivera del Moral durante la tarde porque, conforme a la libreta de mensajes, se le requería hacerlo. Por lo tanto, entiende que no debe disciplinársele por el cargo imputado. No nos persuade el argumento del querellado.

De acuerdo con la prueba desfilada, el querellado Gervitz Carbonell se comunicó telefónicamente con la señora Rivera del Moral sin que ésta se lo requiriese. Aunque el querellado arguye que ni él, ni su esposa, ni su secretaria realizaron la llamada, *éste no presentó evidencia de que la llamada no se originara desde su oficina, para así rebatir lo expresado por la señora Rivera del Moral en su declaración jurada.* Por ejemplo, el querellado no presentó la libreta en la que alegadamente se encontraba el mensaje de la señora Rivera del Moral. Nótese, además, que el Comisionado Especial determinó que la señora Rivera del Moral le inquirió al licenciado Gervitz Carbonell sobre cómo había conseguido su número telefónico, lo que refuerza la conclusión de que ésta no inició el diálogo con el abogado. En consecuencia, no habiendo prueba alguna que demuestre que el primer contacto lo realizó la señora Rivera del Moral, es forzoso concluir que el contacto telefónico original fue a iniciativa del abogado querellado.

Por lo tanto, existe prueba clara, robusta y convincente[15] para concluir que el licenciado Gervitz Carbonell violó el Canon 34 del Código de Ética Profesional, *supra* al contactar directamente, mediante comunicación telefónica, a una cliente potencial sin que ésta se lo requiriera.

En vista de que el licenciado Gervitz Carbonell goza de buena reputación tanto en la comunidad jurídica como en la comunidad en general, y que no ha sido objeto de querella ni de acción civil alguna relacionada con la práctica en los 18 años que ha ejercido como abogado,[16] limitamos su sanción a una censura enérgica, apercibiéndolo de que futuras violaciones a los deberes éticos de la profesión acarrearán sanciones más severas.

B. *Licenciados Izquierdo Stella e Izquierdo San Miguel*

Entre los actos imputados a los licenciados Izquierdo,

---

[15] Véase *In re Caratini Alvarado*, 153 D.P.R. 575 (2001).

[16] Véase Informe del Comisionado Especial, pág. 10.

nos llama particularmente la atención los relacionados al caso de la finada Omayra De León Flores. Surge de autos que éstos advinieron en contacto con los prospectivos clientes —el Sr. Eugenio De León y la Sra. Ana Delia Flores, padres de la difunta— a través de la Sra. Norma Sánchez (empleada de FEMA). Esta última tuvo conocimiento de la situación al advenir en contacto con la hermana de la finada, la Sra. Janet De León, quien le comunicó la preocupación de sus padres *en relación con el futuro de su nieto.* Según el Informe del Comisionado Especial, las señoras Sánchez y Janet De León acordaron visitar a los padres de la segunda. Además, se determinó que la señora Sánchez recomendó al licenciado Izquierdo Stella para que colaborara con los asuntos legales. *Nótese, sin embargo, que los servicios de los querellados no fueron requeridos por los prospectivos clientes con anterioridad a la visita, como tampoco se habló de la presentación de un caso en daños y perjuicios.*

No obstante, el 1 de diciembre de 1996 la señora Sánchez y el licenciado Izquierdo San Miguel acudieron a la residencia de los esposos De León-Flores.[17] En dicha reunión, el licenciado Izquierdo San Miguel logró de manera dolosa que los padres de la finada firmaran un contrato de servicios profesionales, al amparo del cual, posteriormente, presentó junto al licenciado Izquierdo Stella una demanda de daños y perjuicios a nombre de éstos. Ello provocó malestar en los señores De León-Flores, quienes le comunicaron en una segunda visita[18] que no habían autorizado dicho curso de acción, y les informaron a los querellados que ya tenían abogado, el Lcdo. Carlos Mondríguez.

Como si fuera poco, al complicarse el asunto debido a

---

[17] No surge del expediente si la Sra. Janet De León estuvo presente en la reunión.

[18] En esta segunda visita estuvieron presentes ambos querellados, el licenciado Izquierdo Stella y el licenciado Izquierdo San Miguel.

que el licenciado Mondríguez acudió a los medios a denunciar la conducta de algunos abogados en relación con el caso de la explosión de Río Piedras, el licenciado Izquierdo Stella se trasladó al lugar de trabajo del señor De León para que le firmara unos documentos no identificados. Peor aún, al éste negarse a firmarlos, el licenciado Izquierdo Stella le advirtió que entonces tendría que suicidarse.

Indudablemente, los hechos relatados ilustran una conducta inaceptable y violatoria del citado Canon 34 del Código de Ética Profesional. Como se puede observar, gracias a las gestiones de su intermediaria en el lugar de los hechos —la Sra. Norma Sánchez— los licenciados Izquierdo Stella e Izquierdo San Miguel tuvieron acceso personal a unos clientes potenciales, sin que éstos requiriesen de sus servicios. De hecho, el matrimonio De León-Flores ya había gestionado una cita con otro abogado, lo que abona a la conclusión de que la reunión no se concertó a instancias de éstos.

Asimismo, la conducta del licenciado Izquierdo San Miguel de instar dolosamente (explicándole que era por el bien de su nieto) a la señora Flores a firmar unos documentos que resultaron ser un contrato de servicios y la posterior presentación de la demanda sin el consentimiento de los señores De León-Flores, infringe las normas más elementales en contra de la solicitación de clientes. Igualmente, la visita del licenciado Izquierdo Stella al lugar de trabajo del señor De León, amenazándolo con suicidarse si no le firmaba ciertos documentos, representa, cuando menos, una conducta indigna de la profesión.

En cuanto a los restantes señalamientos, resolvemos que el caso de la Sra. Evelyn Fernández también ilustra una violación al referido Canon 34 del Código de Ética Profesional. Ello es así ya que, según estipularon las partes, la visita del licenciado Izquierdo San Miguel a la resi-

dencia de ésta no se dio a solicitud de ella.([19]) Igualmente, la explicación ofrecida por el licenciado Izquierdo San Miguel para justificar su presencia en la residencia de la afectada (que la Cruz Roja le facilitó un listado de potenciales clientes) fue deshonesta, engañosa y conducente a error. Véase *In re Franco Rivera y Masini Soler*, supra.([20])

Por los hechos antes detallados, los querellados se allanan a que se les censure enérgicamente. No estamos de acuerdo.

Según se puede apreciar, los hechos imputados a los licenciados Izquierdo no fueron aislados ni desconectados. Por el contrario, se puede palpar el carácter sistemático de su conducta y la coherencia de su *modus operandi*. Ello nos obliga a concluir que la conducta exhibida no se debió a descuido, falta de circunspección o de vaguedad en el lenguaje, sino más bien a designio y premeditación.

A modo ilustrativo, es difícil obviar que el método utilizado por el licenciado Izquierdo Stella en los hechos aquí mencionados es similar al que empleó en aquellos que le valieron una censura severa de este Tribunal hace varios meses atrás. Véase *In re Izquierdo Stella*, supra. En vista de este historial, lo suspendemos por un período de tres meses del ejercicio de la abogacía y la notaría.

En cuanto al licenciado Izquierdo San Miguel, a pesar de que no tiene un historial de conducta deshonesta ante este Tribunal, la magnitud y seriedad de los cargos que se le probaron en este caso ameritan algo más que una censura. Por lo tanto, lo suspendemos por un período de treinta días de ejercicio de la abogacía y de la notaría.

Le imponemos a los querellados el deber de notificar a todos sus clientes de su presente inhabilidad de continuar

---

([19]) Véase Informe Conjunto del Procurador General y de los querellados José Izquierdo Stella y Jorge Izquierdo San Miguel, pág. 5.

([20]) En cuanto a los restantes señalamientos, de la prueba disponible y del Informe del Comisionado Especial se puede concluir que los contactos establecidos por los licenciados Izquierdo se llevaron a cabo con la anuencia de los clientes potenciales.

representándolos durante el período de la suspensión. Además, deberán devolver cualesquiera honorarios recibidos por trabajos no realizados e informar oportunamente de su suspensión a los foros judiciales y administrativos del país.

## C. Lcdo. Francisco Troncoso

El Procurador General señala que el licenciado Troncoso incurrió en conducta violatoria del Canon 38 del Código de Ética Profesional, *supra,* al presentarse en diferentes medios de comunicación expresándose, en carácter de abogado experto, sobre temas relacionados a la explosión de Río Piedras. Sostiene el Procurador General que, al comenzar a proyectarse en los medios noticiosos desde fecha tan temprana como el día después de la tragedia, el querellado dio la impresión ante el público de que se estaba promocionando para reclutar clientes entre las víctimas de la tragedia. Más aún, indica el Procurador General que el licenciado Troncoso sabía, o debió saber, que ello podría ser interpretado como falta de sensibilidad que afectaría la imagen de la profesión legal. No estamos de acuerdo.

Según las conclusiones del Comisionado Especial, los contactos del licenciado Troncoso con la prensa fueron a iniciativa de los propios periodistas, quienes por conocer de la participación de éste en el litigio relacionado con el desastre del Dupont Plaza, le solicitaron su opinión sobre la tragedia de Río Piedras.

En cuanto a la participación del querellado en el programa televisivo "Al Grano", el Comisionado Especial determinó que ésta respondió a una invitación del Sr. Pedro Zervigón. Además, que las referencias que hizo el licenciado Troncoso ante los medios sobre su participación en el litigio del Dupont Plaza y sobre su experiencia en casos de daños a gran escala, no fueron falsas ni engañosas. Por lo tanto, concluyó que como información veraz, está protegida por las garantías de libertad de expresión contenidas en la Constitución de Estados Unidos y en la Constitución de

Puerto Rico. Adoptamos la conclusión del Comisionado Especial al respecto.

Habida cuenta de que bajo el estado de derecho vigente, el licenciado Troncoso podía dirigirse mediante correo no engañoso a las víctimas conocidas de la explosión desde el primer día de los hechos —*Shapero v. Kentucky Bar Assn.*, supra— y podía anunciarse en radio, prensa escrita y televisión con un mensaje que no contuviera falsedades ni engaños —*Bates v. State Bar of Arizona*, supra— no podemos concluir que el querellado incurrió en conducta deshonesta por haber tenido exposición en los medios noticiosos respondiendo al pedido de los periodistas.

No habiendo otro señalamiento contra el licenciado Troncoso en el presente caso, ordenamos el archivo de la querella presentada en lo que a éste respecta.

D. *Bufete Coale, Cooley and Lietz*

Al bufete de referencia se le imputan dos cargos por violación a los referidos Cánones 34 y 36 del Código de Ética Profesional, respectivamente. Ello en atención a una carta que dirigiesen a clientes potenciales relacionados con la explosión de Río Piedras, la cual el Procurador General entendió era engañosa, conducente a error y constitutiva de solicitación prohibida.

El bufete querellado presentó, el 29 de noviembre de 2000, una Moción Dispositiva, en la cual, entre otras cosas, expresó que debido a la costumbre del bufete de adherirse a los cánones de ética profesional del Distrito de Columbia, percibieron que su conducta en los hechos ante nos estaban enmarcados dentro de los parámetros éticos de nuestra jurisdicción. Por ello, solicitaron que se tomara en cuenta ese hecho como atenuante en el presente caso. No tienen razón.

El Canon 34 del Código de Ética Profesional prohíbe la solicitación personal, ya sea por el abogado personalmente o valiéndose de terceros. Como expresáramos antes, este canon se inspira en la idea de que la contratación de repre-

sentación legal debe darse de forma libre, inteligente y voluntaria, sin que medien persuasiones o presiones directas e indebidas de parte del abogado o de sus representantes. Ese tipo de acercamiento constituye una intromisión con la intimidad de la persona y presenta un problema para el juzgador que evalúa su pertinencia ya que, distinto a la comunicación escrita, es menos susceptible de ser verificada y probada. Véase *In re Franco Rivera y Masini Soler*, supra, pág. 832, y casos allí citados.

En el caso de marras, la carta preparada por Coale, Cooley and Lietz fue entregada personalmente, a nombre del bufete, por el Sr. Ted Dickinson y la Sra. Ricci Marcano. Tal acercamiento fue en ocasiones acompañado de flores y dulces. Siendo le entrega personal y directa, resolvemos que se enmarca dentro de la prohibición que propugna el referido Canon 34, y que no se ubica bajo la excepción de *Shapero v. Kentucky Bar Assn.*, supra. Ello es así ya que ese tipo de contacto supone todos los peligros que pretende atender el Canon 34 y que han sido señalados por el Tribunal Supremo de Estados Unidos en sus decisiones pertinentes, a saber: (1) violentar la intimidad de la persona objeto del daño; (2) poner presión indebida sobre el cliente potencial, quien debe seleccionar a su abogado de manera libre, voluntaria e inteligente, y (3) la dificultad de verificar y probar la naturaleza *del acercamiento*.

Distinto a lo que el bufete querellado quiere representar, no estamos ante un caso que ha de evaluarse al amparo de *Shapero v. Kentucky Bar Assn.*, supra. O sea, no se trata de una carta enviada por correo en la que nuestra función revisora se limita a evaluar el lenguaje de la comunicación, para determinar si ésta es engañosa o conducente a error. Véase *In re Franco Rivera y Masini Soler*, supra. Se trata, por el contrario, de un caso de solicitación personal. En consecuencia, resolvemos que se violó el Canon 34, *supra*, sin necesidad de entrar a considerar el lenguaje empleado en la carta.

Ello, no obstante, no debe interpretarse como que condonamos o aceptamos como veraz o apropiado el lenguaje utilizado en la carta de referencia. Por el contrario, el lenguaje utilizado por el bufete en algunas secciones de la carta es engañoso y conducente a error. Por ejemplo, al expresar que "muy pocos tienen el tiempo y los recursos financieros para llevar un caso como éste hasta sus últimas consecuencias", el bufete pudo crear en el recipiente de la misiva la idea de que el único modo de recibir compensación era llevando el caso hasta sus últimas consecuencias. Es decir, la carta no le informa debidamente al cliente potencial que el caso también puede ser transigido extrajudicialmente. Abona a esta conclusión la expresión a los efectos de que

> [s]i bien muchos bufetes de los Estados Unidos y Puerto Rico participaron en el último desastre del tal magnitud en Puerto Rico (el incendio del Hotel Dupont Plaza), *fuimos nosotros el único bufete que en última instancia llevó el caso a juicio.* (Énfasis suplido.) Informe del Comisionado Especial, pág. 27.

Asimismo, la expresión de que el bufete es uno de los "más prestigiosos para casos de incendios y explosiones", y que "como tal est[án] en una posición privilegiada para poder proporcionarle una excelente representación legal, y la máxima compensación posible", íd., nos resulta conducente a error, ya que crea unas expectativas irrazonables de éxito en el cliente potencial. Igualmente, nos resulta inapropiado el uso de expresiones autoelogiosas y comparativas tan explícitas.

▪ Por último, resolvemos que el hecho de que la única cliente que el bufete logró contratar se muestre satisfecha con la labor que se viene realizando a su favor y de que no se haya probado algún otro daño, no es paliativo que exonere al bufete querellado. El Tribunal Supremo de Estados Unidos ha resuelto, y este Tribunal ha adoptado, la norma de que los cánones que prohíben la solicitación

personal son de naturaleza profiláctica, que en nada dependen de probar la ocurrencia de algún daño específico. Véase *Ohralik v. Ohio State Bar Assn.*, supra, pág. 468; *In re Franco Rivera y Masini Soler*, supra, pág. 832. Por lo tanto, el enfoque del juzgador debe ser la conducta desplegada y no sus efectos. *Íd.*

- Por los hechos que hemos encontrado probados corresponde la imposición de sanciones. Sin embargo, en vista de las particularidades del presente caso, debemos indagar sobre nuestra facultad para disciplinar a Coale, Cooley and Lietz. Veamos.

La presentación de la querella de marras en contra del bufete de referencia responde a que éste acudió a Puerto Rico a gestionar de manera impropia clientes potenciales relacionados con la explosión de Río Piedras. Es decir, a pesar de que Coale, Cooley and Lietz tiene su sede en el Distrito de Columbia, *es un hecho probado que dicho bufete optó por extender su práctica profesional a nuestra jurisdicción.* Toda vez que este bufete está radicado en Washington, D.C. y que presumiblemente los abogados que lo componen tienen el grueso de su práctica profesional en esa jurisdicción, debemos abordar la autoridad que tenían éstos para practicar la abogacía en Puerto Rico y nuestra jurisdicción para imponerle sanciones.

Reiteradamente hemos expresado que este Tribunal tiene el poder inherente y exclusivo para admitir abogados a la práctica de la profesión. *In re Peña Peña*, supra; *In re Bosch*, 65 D.P.R. 248 (1945); *Ex parte Jiménez*, 55 D.P.R. 54 (1939). En virtud de dicha autoridad, el Tribunal Supremo de Puerto Rico aprobó el Reglamento de la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía, 4 L.P.R.A. Ap. VII-B, Rs. 1–18 (Reglamento de Aspirantes), el cual estableció el esquema jurídico para reglamentar el ejercicio de la abogacía en Puerto Rico. Con el propósito de proteger a la ciudadanía de personas no aptas para el ejercicio de la profesión legal, el referido regla-

mento instituyó los requisitos mínimos con los que debe cumplir todo aspirante a ejercer como abogado en el Estado Libre Asociado. Así, la Regla 4 del Reglamento de Aspirantes, *supra*, establece los siguientes requisitos para ser admitido a ejercer en nuestra jurisdicción: (1) ser mayor de veintiún años de edad; (2) haber cursado estudios de Derecho, obtenido y aprobado el grado correspondiente al título de abogado en una escuela de Derecho aprobada por la *American Bar Association* o por el tribunal; (3) ser persona de buena reputación; (4) aprobar un examen de reválida general preparado, administrado y evaluado por la Junta, y (5) haber obtenido, antes de su admisión a una Escuela de Derecho, el grado universitario de bachillerato si son egresados de instituciones en Estados Unidos o Puerto Rico.

Igualmente, el Reglamento del Tribunal Supremo expone en su Regla 12 (4 L.P.R.A. Ap. XXI-A) los requisitos para ejercer la abogacía en Puerto Rico. Además de la admisión mediante examen que dispone la Regla 12(a), la Regla 12(e) de dicho Reglamento provee para la admisión por cortesía, disponiendo, en su parte pertinente, que:

[c]ualquier persona admitida al ejercicio de la abogacía en un estado o territorio de los Estados Unidos de América o en el Distrito de Columbia podrá ser autorizada por cortesía por este tribunal para postular como abogado(a) en Puerto Rico en casos especiales.

La solicitud deberá ser endosada por un(a) abogado(a) admitido(a) al ejercicio de su profesión por este tribunal, quien dará fe de la capacidad de la persona solicitante para postular como abogado(a) en el caso correspondiente. Deberá unirse a la misma un certificado expedido por el más alto tribunal del estado en el cual la persona solicitante esté admitida al ejercicio de la profesión, haciendo constar el hecho de su admisión y que a la fecha del certificado se mantiene debidamente acreditado. Tanto la persona solicitante como el(la) abogado(a) que endose su solicitud deberá hacer constar que la primera domina el español. De lo contrario, la autorización que expida este tribunal exigirá que la persona solicitante postule acompañada por un(a) abogado(a) del foro puertorriqueño que domine tanto el español como el inglés. 4 L.P.R.A. Ap. XXI-A.

El inciso (f) de la Regla 12 del mismo Reglamento, *supra*, dispone otra manera de practicar la abogacía en Puerto Rico sin necesidad de tomar el examen de reválida: la admisión al ejercicio de la profesión por estudiantes de Derecho. Según la referida regla, aquellos estudiantes matriculados en Escuelas de Derecho debidamente acreditadas y que hayan —entre otras cosas— completado al menos dos terceras partes de los créditos requeridos para el grado de *Juris Doctor*, y que se desempeñen bajo la supervisión de un abogado admitido a ejercer la abogacía por este Tribunal, podrán ejercer la abogacía ante los tribunales de Puerto Rico.[21]

La práctica de la abogacía fuera de las instancias antes descritas representa un acto ilegal constitutivo de delito menos grave. Sobre ese particular, la Sec. 7 de la Ley Núm. 17 de 10 de junio de 1939, según enmendada, 4 L.P.R.A. sec. 740, dispone lo siguiente:

> [n]inguna persona que no sea abogado autorizado por el Tribunal Supremo de Puerto Rico podrá dedicarse al ejercicio de la profesión de abogado, *ni anunciarse como tal*, ni como agente judicial, ni gestionar, con excepción de asuntos propios, ningún asunto judicial o cuasi judicial ante cualquier tribunal judicial. (Énfasis suplido.)[22]

Asimismo, el Canon 33 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, impone al abogado la obligación de evitar la práctica de la abogacía y la notaría por individuos no autorizados. Dicho canon también prohíbe que un abogado no admitido en nuestra jurisdicción suministre consejo legal a los clientes de un abogado *aunque se trate de un asunto fuera de los tribunales*. Las prohibiciones estatuidas en las disposiciones precedentes se justifican, no como un medio para eliminar la competencia en la profe-

---

[21] La Regla 12(f), 4 L.P.R.A. Ap. XXI-A, enumera siete requisitos para poder ejercer siendo estudiante de Derecho.

[22] Véase, además, el Art. 12 de la Ley del Colegio de Abogados de Puerto Rico, 4 L.P.R.A. sec. 782.

sión legal, sino como un ejercicio del poder de razón de estado para la protección del público de personas no cualificadas o no diestras. *Pueblo v. Santaella*, 91 D.P.R. 350 (1964).

En el caso de marras, tenemos la particular situación de que ningún abogado de Coale, Cooley and Lietz compareció como firmante en la carta que ofrecía los servicios del bufete a las víctimas de la explosión de Río Piedras. Además, las gestiones de entrega de la referida carta las llevaron a cabo dos individuos que no son abogados. Tampoco surge de los escritos y documentos que obran en autos la identidad de algún abogado de dicha firma legal. Por lo tanto, ante la incomparecencia de algún abogado del bufete querellado nos vemos imposibilitados de constatar si los miembros de dicha firma que estaban encargados del asunto de la explosión, *y que autorizaron el curso de acción emprendido*, estaban admitidos a practicar el Derecho en Puerto Rico mediante alguna de las tres formas permitidas en nuestro ordenamiento. Adviértase que aunque el referido bufete no presentó ninguna demanda ante los tribunales del Estado Libre Asociado, la práctica de la profesión, según definida en la citada Sec. 7 de la Ley Núm. 17, *supra*, no se limita a comparecer ante los tribunales, y se extiende a identificarse y representar ser abogado para agenciarse la representación legal de clientes potenciales.[23]

---

[23] A modo de referencia, la Comisión sobre Práctica Multijurisdiccional de la American Bar Association recomendó enmendar la Regla Modelo 5.5 para que exprese, en lo pertinente, lo siguiente:

*"Rule 5.5: Unauthorized Practice of Law; Multijurisdictional Practice of Law*

"(a) A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so.

"(b) A lawyer who is not admitted to practice in this jurisdiction shall not:

"(1) except as authorized by these Rules or other law, establish an office or other systematic and continuous presence in this jurisdiction for the practice of law; or

"(2) *hold out to the public or otherwise represent that the lawyer is admitted to practice law in this jurisdiction.*" American Bar Association, *Client Representation in the 21st Century: Report on the Comission on Multijurisdictional Practice*, 2002, pág. 79.

El Comentario [9] a esta regla dispone que:

En consecuencia, se remite el asunto al Procurador General para que investigue cuáles abogados de Coale, Cooley and Lietz estaban a cargo del caso que nos ocupa, para así determinar si éstos estaban admitidos al ejercicio de la abogacía en Puerto Rico al momento en que ocurrieron los sucesos en controversia. Ello es importante para determinar no sólo la posible práctica ilegal de la abogacía por parte de algunos de los miembros del bufete querellado —lo que implicaría responsabilidad profesional y penal— sino también para adjudicar responsabilidades por los cargos imputados en la presente querella, los cuales encontramos probados en los párrafos anteriores.

Finalmente, dado que no hay prueba en autos que refleje que el bufete querellado se anunciase en los medios, ordenamos el archivo del cargo por violación al Canon 36 del Código de Ética Profesional, *supra.*

*Se dictará sentencia de conformidad.*

La Juez Presidenta Señora Naveira Merly no interviene. Los Jueces Asociados Señores Rebollo López y Fuster Berlingeri no intervinieron.

---

"[l]awyers not admitted generally in a jurisdiction may be authorized by law or order of a tribunal or an administrative agency to appear before the tribunal or agency. This authority may be granted pursuant to formal rules governing admission *pro hac vice* or pursuant to informal practice of the tribunal or agency .... *To the extent that a court rule or other law of this jurisdiction requires a lawyer who is not admitted to practice in this jurisdiction to obtain admission pro hac vice before appearing before a tribunal or administrative agency, this Rule requires the lawyer to obtain that authority.*" (Énfasis suplido.) Íd., pág. 81.