EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re: José R. Franco Rivera | 2006 TSPR 170<br><br>169 DPR ____ |

Número del Caso: CP-2003-13

Fecha: 16 de octubre de 2006

Abogado de la Parte Peticionaria:

Lcdo. Edwin Gutiérrez Torres

Oficina del Procurador General:

Lcda. Cynthia Iglesias Quiñones
Procuradora General Auxiliar

Lcdo. Kenneth Pamias Velázquez
Subprocurador General

Lcda. Miriam Soto Contreras
Procuradora General Auxiliar

Lcda. Maite Oronoz Rodríguez
Subprocuradora General

Lcdo. Salvador J. Antonetti Stutts
Procurador General

Materia: Conducta Profesional
(La suspensión del abogado advino final y firme el día 16 de noviembre de 2006.)

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re*

José R. Franco Rivera

                    CP-2003-13

PER CURIAM

San Juan, Puerto Rico, a 16 de octubre de 2006

La conducta que da lugar a la presente acción disciplinaria tiene su génesis en una queja presentada ante este Tribunal por José L. Vázquez Pedrosa contra el Lcdo. José R. Franco Rivera por éste alegadamente haber abandonado su caso, sin informárselo previamente; incumpliendo, de este modo, el contrato de servicios profesionales suscrito entre ambos a través del cual dicho letrado había asumido la representación legal en un pleito contra su patrono por despido injustificado.[1]

---

[1] El licenciado Franco Rivera fue admitido al ejercicio de la abogacía el 15 de mayo de 1981 y al ejercicio del notariado el 17 de junio de 1981.

En la referida queja Vázquez Pedrosa alegó, en síntesis, que --luego de que el licenciado Franco Rivera abandonara su caso-- le había solicitado infructuosamente en varias ocasiones que le reembolsara los $1,500 de "retainer fee" que tuvo que entregarle al momento de contratar sus servicios. Expresó que, asimismo, le había requerido --por teléfono y mediante correo certificado con acuse de recibo-- que le hiciera entrega de su expediente y de cualquier otro documento relacionado con su caso, los cuales hasta el momento de presentar la queja no había recibido. A esos efectos, argumentó que aun cuando, al llamar en una ocasión a la oficina del licenciado Franco Rivera, la secretaria de éste le había indicado que el 9 de abril de 2002 podía pasar a recoger las copias de dichos documentos, las mismas nunca estuvieron disponibles para su entrega.[2]

Oportunamente, el licenciado Franco Rivera presentó su contestación a la referida queja, reiterando lo expresado en  una carta que le había enviado a Vázquez Pedrosa, con fecha de 6 de febrero de 2002, a los efectos

---

[2] Vázquez Pedrosa incluyó varios documentos con su queja; a saber: copia de dos cartas que le envió al licenciado Franco Rivera una del 10 de enero de 2002 y otra del 28 de febrero del mismo año, con sus respectivos acuses de recibo; copia del contrato de servicios profesionales que suscribió con el licenciado Franco Rivera el 27 de agosto de 1998; y copia de tres cheques emitidos a favor del licenciado Franco Rivera, uno del 31 de agosto de 1998 por la suma de $1,000, otro del 29 de noviembre de 1998 por la cantidad de $500 y el último del 13 de junio de 2000 por la suma de $280.06 para un total de $1,780.06.

de que en junio de 2001 ––a través de otra carta–– le había informado que iba a renunciar a su caso[3] y, de otra parte, que era improcedente el reembolso del dinero solicitado. En cuanto a las razones para terminar su relación profesional con Vázquez Pedrosa, en la referida carta el mencionado abogado indicó que mayormente se debió a la decisión de Rubén Ramos Peña ––su asistente y la persona a través de la cual Vázquez Pedrosa contrató sus servicios–– de no continuar trabajando en los casos laborales que él había referido a la oficina, lo cual le había dejado "un vacío logístico para poder yo continuar manejando los casos ya que carecía de tiempo para llevar sus gestiones a cabo".

Específicamente, con respecto al incidente con su secretaria, señaló el abogado que, debido a lo voluminoso del expediente, se le habían solicitado unos días a Vázquez Pedrosa para que pudieran sacarle las copias correspondientes. Arguyó que efectivamente, se consiguieron dichas copias y desde entonces estuvieron disponibles para entregárselas a Vázquez Pedrosa ––según se le había notificado por la vía telefónica–– quien en lugar de recogerlas aparentemente prefirió acudir ante este Foro. Por último, en cuanto al reembolso del dinero, sostuvo el abogado que ––debido a que en nuestro ordenamiento los abogados tienen un derecho a cobrar una

---

[3] El licenciado Franco Rivera nunca presentó copia de esa carta ante este Tribunal.

cantidad de dinero por el esfuerzo realizado y toda vez que para la tramitación del caso de Vázquez Pedrosa tomó deposiciones, se reunió con los abogados contrarios y llevó a cabo investigaciones-- no procedía su devolución.

Examinadas las antes mencionadas comparecencias, referimos el asunto a la Oficina del Procurador General de Puerto Rico. Estando el caso ante dicha Oficina --y alegadamente intentando evitar que su caso fuera desestimado por la inacción del licenciado Franco Rivera-- el 12 de agosto de 2002 Vázquez Pedrosa envió una carta al entonces Procurador General, el Hon. Roberto J. Sánchez Ramos, solicitando su intervención inmediata para que, lo antes posible, el licenciado Franco Rivera le enviara copia de su expediente y, a su vez, presentara evidencia sobre los pagos realizados para gastos adicionales que se incurrieron por motivo de su pleito para los cuales tuvo que desembolsar dinero adicional.

En virtud de lo anterior, el 22 de agosto de 2002, el Procurador General le envió una carta al licenciado Franco Rivera concediéndole un término de diez días para que demostrara que --por correo o por mensajero-- había realizado la entrega del expediente a Vázquez Pedrosa. No obstante lo anterior, y transcurrido el mencionado término, el 19 de septiembre de 2002 Vázquez Pedrosa nuevamente se comunicó con el Procurador General indicándole que todavía no había recibido sus documentos.

Así las cosas, el 14 de octubre de 2002 el Procurador General rindió un informe con sus hallazgos y recomendaciones en el cual concluyó que el licenciado Franco Rivera había incurrido en conducta contraria a las disposiciones de los Cánones 18, 19, 20 y 24 de los de Ética Profesional, 4 L.P.R.A. Ap. IX. Luego de examinar el referido informe, y la contestación presentada por el licenciado Franco Rivera, el 14 de marzo de 2003 emitimos una Resolución ordenándole al Procurador General que presentara la correspondiente querella disciplinaria contra el licenciado Franco Rivera. A su vez, --y para que existiera constancia de dicho acto-- le ordenamos al licenciado Franco Rivera a entregar inmediatamente el expediente del caso de Vázquez Pedrosa a la oficina del Procurador General.

Para coordinar dicha entrega y luego de recibir una carta de la Oficina del Procurador General, el licenciado Franco Rivera por la vía telefónica informó que entregaría el expediente el 15 de abril de 2003. Sin embargo, no lo entregó ese día ni se comunicó con dicha Oficina para excusarse.

Así pues, el 20 de mayo de 2003, el Procurador General radicó la querella contra el Lcdo. José R. Franco Rivera formulándole cuatro (4) cargos por alegadas violaciones a los Cánones 18, 19, 20 y 24 de Ética Profesional, 4 L.P.R.A. Ap. IX. Específicamente, en la referida querella se le imputó haber violado el Canon 20

de los de Ética Profesional, 4 L.P.R.A. Ap. IX C. 20, que dispone el trámite a seguir para renunciar o ser relevado de la representación del cliente. A su vez, se le imputó haber violado dicho Canon al no entregar, al terminar en sus funciones, de inmediato y sin dilación alguna el expediente del caso a su cliente luego de que éste en varias ocasiones así lo solicitara, <u>con el agravante que a la fecha de la radicación de la querella --en incumplimiento con los requerimientos de la Oficina del Procurador General y luego de este Foro habérselo ordenado-- aún no lo había entregado</u>.

Se le imputó, además, no haber presentado un desglose de los servicios que realizó y los gastos en que incurrió en la tramitación del caso de Vázquez Pedrosa que justificara la retención de los $1,500 entregados como "retainer fee", ello en violación del Canon 24 de los de Ética Profesional, 4 L.P.R.A. Ap. IX C.24, que le impone el deber de cobrar honorarios de abogados razonables o en violación del antes mencionado Canon 20, ante, que exige que los abogados devuelvan aquellos honorarios de abogado y gastos que fueron pagados pero no devengados.

Asimismo, se le imputó haber violado el deber impuesto por el Canon 19 de los Ética Profesional, 4 L.P.R.A. Ap. IX C. 19, al no haber mantenido informado a su cliente de todo asunto importante relacionado con su caso, ello en vista de que Vázquez Pedrosa desconocía que una persona que no era su abogado estaba encargada de su

caso y, a su vez, desconocía en qué etapa se encontraba el mismo. Cónsono con lo anterior, se le imputó haber incumplido con el deber exigido por el Canon 18 de los de Ética Profesional, 4 L.P.R.A. Ap. IX C. 18, al no haber tramitado diligentemente los asuntos que le fueron delegados por su cliente.

Finalmente, dos días después de presentada la querella, el licenciado Franco Rivera hizo entrega del expediente a la Oficina del Procurador General;[4] posteriormente radicó su contestación a la querella. En su comparecencia negó haber violado los Cánones de Ética Profesional antes mencionados. En cuanto al expediente, reiteró que estuvo disponible en su oficina pero que Vázquez Pedrosa no lo había recogido --a pesar de que en varias ocasiones personal de su oficina se comunicara con él-- porque aparentemente no le agradó que tuviera que recogerlo personalmente y cuando él estuviera presente.

Respecto al procedimiento que siguió al presentar su renuncia como abogado del caso, arguyó que a Vázquez Pedrosa se le había notificado mediante una carta a esos efectos y a través de Ramos Peña, quien había referido el caso de Vázquez Pedrosa a su oficina. Indicó que Vázquez Pedrosa en todo momento tuvo conocimiento de que Ramos Peña --a quien conocía previamente y con quien suscribió un contrato de asesoría-- estaba trabajando su caso y era

---

[4] Vázquez Pedrosa recogió dicho expediente el 23 de mayo de 2003.

éste quien lo mantenía informado en todo momento del desarrollo de su pleito.[5]

Respecto a la devolución del dinero, señaló que al recibir el expediente el Procurador General debió haberse percatado que el mismo incluía seis (6) deposiciones en el caso y varias vistas ante el Tribunal de Distrito Federal para el Distrito de Puerto Rico, lo cual ameritaba la cantidad cobrada. No obstante, señaló que, si en algo atenuaba este trámite la devolución de dicha suma, estaba en la disposición de así hacerlo. Por último, sostuvo que un estudio del voluminoso expediente revelaba, a su vez, el trabajo arduo y capaz que llevó a cabo a favor de Vázquez Pedrosa, lo cual evidenciaba que no falló en defender los intereses de su cliente diligentemente.

Designamos al Hon. José Alberto Morales Rodríguez, Juez del Tribunal de Apelaciones, como Comisionado Especial para que recibiera la prueba que presentaran las partes y rindiera un informe a este Tribunal con las determinaciones de hecho y recomendaciones que entendiera procedentes. En cumplimiento con nuestra encomienda, luego de varios trámites e incidentes procesales y celebrada la

---

[5] A esos efectos, el licenciado Franco Rivera indicó que tenía copia de un contrato del 3 de septiembre de 1997 suscrito, sin su conocimiento, entre Vázquez Pedrosa y Ramos Peña mediante el cual el querellante contrató los servicios de Ramos Peña como su asesor en todo lo relacionado con una querella de despido injustificado y discrimen contra su patrono, que surgió de los mismos hechos por los cuales Vázquez Pedrosa contrató sus servicios.

vista del caso, el 16 de septiembre de 2005, el Comisionado Especial Morales Rodríguez nos rindió su informe.[6]

                              I

Procedemos a enfatizar algunos hechos que son relevantes e importantes; ello con el propósito de facilitar la cabal comprensión del presente caso. Vázquez Pedrosa y Ramos Peña fueron compañeros de trabajo en una compañía llamada Crowley American Transport. Con motivo de una reducción de personal que llevó a cabo dicha compañía, ambos fueron cesanteados.[7]

Considerando que fue despedido discriminatoriamente por razón de su edad ––ello en vista de que, alegadamente, un empleado más joven retuvo un puesto que envolvía las mismas funciones que él llevaba a cabo–– Ramos Peña radicó una querella contra CAT ante la Unidad Antidiscrimen del Departamento del Trabajo y Recursos Humanos de Puerto Rico, en adelante la Unidad Antidiscrimen, y, cumplidos los trámites de rigor, una demanda por derecho propio ante el Tribunal de Distrito Federal para el Distrito de Puerto Rico contra CAT y CMC. Tras haber iniciado dicho pleito,

---

[6] En la vista en su fondo testificaron Vázquez Pedrosa, Ramos Peña y el Lcdo. Franco Rivera.

[7] Crowley American Transport era una subsidiaria de Crowley Maritime Corporation, en adelante, CMC. Específicamente, dicha compañía se dedicaba a la industria de transportación marítima, operando en los Estados Unidos, Puerto Rico y en puertos internacionales.

Ramos Peña contrató los servicios del licenciado Franco Rivera para que lo representara en el caso.

Impresionado con la forma en que Ramos Peña había manejado su caso, --debido a sus estudios avanzados en el área de recursos humanos y a su amplia experiencia en casos de discrimen habiendo radicado varias querellas administrativas en la Unidad Antidiscrimen-- el licenciado Franco Rivera contrató los servicios de Ramos Peña para que lo asistiera en el trabajo y manejo técnico de los casos, siendo su "asesor técnico paralegal". Conforme a lo anterior, el 17 de diciembre de 1997 éstos suscribieron un contrato de servicios profesionales.[8] En dicho contrato, pactaron cuáles serían las labores que Ramos Peña llevaría a cabo y cuáles serían sus honorarios. A tales efectos, expresamente acordaron que Ramos Peña recibiría una suma equivalente al cincuenta por ciento (50%) de aquella que,

---

[8] Conforme al contrato, las funciones de Ramos Peña eran las siguientes: reunirse inicialmente con prospectos clientes para recibir información y documentación pertinente al caso; en aquellos casos aplicables, redactar proyectos de querella para ser radicada en el foro administrativo luego de consultarse con el cliente; investigación legal de aquellos casos legales aplicables a controversias a presentarse en cada caso particular; asistencia con clientes para preparación de interrogatorios, tanto a nivel administrativo como judicial; asistencia con clientes para preparación de toma de deposiciones; asistencia con clientes para preparación de interrogatorios; asistencia a vistas administrativas y judiciales para asistir al abogado; asistencia al abogado para preparación de proyectos de informe para conferencia con antelación a juicio; asistencia al abogado para reuniones transaccionales con clientes; y cualquier otra gestión que resultara importante para lograr el mejor manejo y disposición de los casos trabajados.

por concepto de honorarios de abogado, pudiera percibir el licenciado Franco Rivera "en las correspondientes disposiciones finales de los casos trabajados ya fuere [sic] por transacción o por Sentencia y su debida ejecución". De igual forma, pactaron dividir por partes iguales cualquier cantidad de anticipo de "retainer fee" que se le requiriera a los clientes. En dicho contrato no se hizo constar diferencia alguna con respecto a la distribución de los honorarios si el cliente llegaba a la oficina del licenciado Franco Rivera referido por Ramos Peña o si llegaba por cuenta propia.

De otra parte, y en el entretanto, --también inconforme con su despido-- Vázquez Pedrosa recurrió a Ramos Peña para solicitarle asesoramiento con respecto a la posibilidad de presentar algún tipo de querella contra CAT. Así pues, el 3 de septiembre de 1997 Vázquez Pedrosa suscribió un contrato con Rubén Ramos Peña, titulado "Contrato de Consulta Laboral". En dicho contrato se hizo constar que Vázquez Pedrosa contrataba los servicios de Ramos Peña para que lo asesorara con respecto a una querella de despido injustificado y discrimen contra CAT. A su vez, se pactó que en la eventualidad de que la querella tuviera que ser radicada ya bien fuera en los tribunales estatales o federales, se autorizaba a Ramos Peña, a hacer las gestiones que entendiera necesarias para la contratación de un abogado. Se acordó, además, que los honorarios de Ramos Peña serían el 20% de cualquier suma

de dinero recibida por Vázquez Pedrosa como consecuencia de la querella. Finalmente, se pactó que si el caso tenía que ser radicado ante un tribunal, Vázquez Pedrosa únicamente tendría que pagar los honorarios al abogado que serían el 33.5% de cualquier dinero recibido.

Conforme a dicho contrato, Vázquez Pedrosa sometió una querella --sin mediación de abogado y con la ayuda de Ramos Peña-- en la Unidad Antidiscrimen alegando haber sido despedido discriminatoriamente por CAT por razón de su edad. Posteriormente, y debido a que deseaba presentar las correspondientes demandas ante los foros estatales y federales por los mismos hechos por los cuales entabló la querella, el 27 de agosto de 1998 Vázquez Pedrosa --referido por Ramos Peña-- contrató los servicios del licenciado Franco Rivera. Dicho acuerdo consta en un documento titulado "autorización y contrato" suscrito entre las partes el 27 de agosto de 1998. En el mismo expresamente se hizo constar que la naturaleza del caso era "[v]iolación a Ley de Derecho Civiles por discrimen en el trabajo y a otras leyes laborales tanto federales como estatales".

Además, en dicho contrato, se estableció una cláusula especial de honorarios donde se acordó que el licenciado Franco Rivera cobraría el 33% de la suma que se recuperara en el caso. De igual forma, se estableció que Vázquez Pedrosa pagaría la suma de $1,500.00 de "retainer fee", el cual se dividiría en dos pagos; a saber, pagaría $1,000 a

la fecha de la firma del contrato y el balance restante de $500.00 lo pagaría a la fecha de la radicación de la demanda en el Tribunal Federal.[9]

Así las cosas, y habiendo pagado las referidas sumas de dinero, Vázquez Pedrosa y otros ex-compañeros de trabajo --Samuel Maldonado Maldonado, David Marchany Navarro y Juan Rivera Olavaria-- radicaron una demanda contra CAT, CTT y su corporación matriz CMC ante el Tribunal de Distrito Federal para el Distrito de Puerto Rico, representados por el licenciado Franco Rivera. Específicamente, se alegó, entre otras cosas, discrimen por razón de edad, ello en vista de que alegadamente la compañía retuvo empleados más jóvenes quienes continuaban llevando a cabo sus mismas funciones y, a su vez, que los candidatos seleccionados para las nuevas plazas eran más jóvenes.[10]

---

[9] Para esa misma fecha el Lcdo. Franco Rivera asumió la representación legal de otros empleados que también fueron despedidos; a saber, Samuel Maldonado Maldonado, David Marchany Navarro y Juan Rivera Olavaria, todos eran mayores de cuarenta (40) años y ex-empleados de CAT, menos Rivera Olavarría que era ex-empleado de CTT. Sin embargo no surge claramente del expediente si éstos también fueron referidos por Ramos Peña.

[10] Dicha demanda se presentó al amparo de varios estatutos federales; a saber, el Título VII de la Ley Federal de Derechos Civiles, ante, ADEA, la sección 8(a)(5) de la Ley Nacional de Relaciones del Trabajo National Labor Relations Act, 29 U.S.C. § 158(a)(5), Orden Ejecutiva Federal Número 11246, y el "Vietnam Era Veterans Readjustment Act", ante. De igual forma, se presentaron reclamaciones estatales al amparo de la Ley Núm. 80 del 30 de mayo de 1976, 29 L.P.R.A. §185a et seq y la Ley Núm. 100 del 30 de junio de 1975, 29 L.P.R.A. § 146 et seq.

Luego de varios trámites e incidentes procesales y presentada una moción de sentencia sumaria por CAT, el 13 de noviembre de 2000 <u>el tribunal federal emitió una opinión y orden desestimado la demanda por insuficiencia en las alegaciones</u>. De este modo, desestimó con perjuicio todas las reclamaciones federales y sin perjuicio las causas de acción estatales. Vale la pena señalar que en dicha sentencia, el referido foro destacó que emitía su determinación sin la oposición de los demandantes a la moción de sentencia sumaria, toda vez que éstos aunque habían solicitado una prórroga para presentar su comparecencia nunca lo hicieron.[11] El licenciado Franco Rivera <u>no</u> apeló dicha determinación, por lo cual la decisión advino final y firme.[12]

Posteriormente, el 28 de febrero de 2001 el licenciado Franco Rivera, en representación de todos los

---

[11] Surge del informe del Comisionado Especial que durante la vista en su fondo el querellado testificó que no presentó la oposición a dicha moción debido a que los argumentos eran tan contundentes que no tenía hechos con los cuales impedir la sentencia solicitada.

[12] De igual forma, el 26 de octubre de 2001 el caso de Ramos Peña fue desestimado. En dicho caso el tribunal federal determinó que la reorganización de la compañía debido a una reducción en el trabajo era una razón legítima y no discriminatoria para despedir a Ramos Peña; que éste falló en establecer una reclamación de discrimen al amparo del Título VII; que éste no tenía una causa de acción privada por la alegada violación a la orden ejecutiva federal; y que el patrono no estaba sujeto a los requisitos del "Worker Adjustment and Retraining Notification Act", ante. Dicha determinación sí fue apelada pero el Tribunal Apelativo del Primer Circuito de Boston confirmó la desestimación.

demandantes, presentó una demanda ante el Tribunal de Primera Instancia de Puerto Rico contra CAT y la Unión alegando que CAT no cumplió con el convenio colectivo y, por su parte, que la Unión no negoció de buena fe o representando fielmente los intereses de los unionados. CAT solicitó la remoción del caso al foro federal alegando que éste era el que tenía jurisdicción al amparo de la sección 301 de la Ley Federal de Relaciones del Trabajo, "Labor Management Relations Act", 29 U.S.C. § 141 *et seq*.

Es preciso señalar que en el transcurso de estos trámites, surgió un conflicto entre Ramos Peña y el licenciado Franco Rivera con respecto a la forma en que iban a dividir las ganancias de los casos.[13] El problema consistió en que luego de haber firmado el antes mencionado contrato con Ramos Peña y sin haberlo estipulado, el licenciado Franco Rivera quiso diferenciar el método de pago de los honorarios, distinguiendo entre los clientes que Ramos Peña refería a la oficina --por los cuales le pagaría, conforme establecía dicho contrato, la mitad de sus honorarios-- y los que llegaban directamente sin intermediario, por los cuales pagaría una cantidad menor debido a que consideraba injusto dividir la mitad de sus honorarios tomando en consideración que él era quien pagaba los gastos de oficina, secretaria, electricidad,

---

[13] Dicho conflicto consta en un intercambio epistolar entre el Lcdo. Franco Rivera y Ramos Peña. Copia de dichas cartas constan en el expediente.

teléfono, fax, copiadora, mensajería, etc.[14] Por su parte, Ramos Peña consideraba que, en virtud de lo acordado, tenía derecho a la mitad de los honorarios en todos los casos que trabajara sin importar la forma en que hubiesen llegado a la oficina. A consecuencia de este conflicto Ramos Peña comenzó a trabajar para otros abogados como consultor y el licenciado Franco Rivera decidió renunciar a la representación legal de Vázquez Pedrosa y los otros demandantes.

Luego de que el caso fuera removido al foro federal, el licenciado Franco Rivera solicitó de Ramos Peña --quien era el que los mantenía en todo momento informados a los demandantes sobre el desarrollo del caso tanto ante foro federal como el estatal-- que les notificara a Vázquez Pedrosa y a los otros demandantes su intención de renunciar a su caso. De este modo, luego de que Ramos Peña le notificara lo anterior a los demandantes y habiéndoselo informado al tribunal, el 25 de junio de 2001 el licenciado Franco Rivera presentó su moción de renuncia a la representación legal de los demandantes, la cual fue autorizada el 9 de julio de 2001.

En virtud de lo anterior, el tribunal federal comenzó a notificar directamente a Vázquez Pedrosa y a los otros

---

[14] No surge del expediente exactamente cuál sería la división de los honorarios cuando los casos llegaran directamente a la oficina del Lcdo. Franco Rivera, sólo consta que sería menos del cincuenta por ciento que era lo que recibía Ramos Peña si el caso llegaba por su referido.

demandantes todas sus órdenes. El 15 de octubre de 2001, debido a que los demandantes no comparecieron a una conferencia sobre el estado del caso, el referido foro emitió una orden concediéndoles treinta (30) días para que comparecieran con su nuevo abogado, o por derecho propio, explicando las razones por las cuales no habían podido conseguir un nuevo abogado so pena de desestimar su demanda. En vista de ello, por iniciativa de Ramos Peña y con su ayuda, los demandantes presentaron una moción por derecho propio informándole al tribunal que habían intentado sin éxito localizar al licenciado Franco Rivera al cual no habían encontrado por haberse mudado de oficina, por lo cual no habían podido solicitar un nuevo representante legal.

Días más tarde, el 9 de noviembre de 2001, el tribunal federal emitió otra orden. De entrada, les advirtió a los demandantes que el licenciado Franco Rivera había solicitado y recibido la autorización del tribunal para renunciar a su representación. A su vez, les notificó que su moción no cumplía con lo requerido por su orden anterior.

Así las cosas, los demandados presentaron una moción solicitando la desestimación de la demanda por constituir las controversias planteadas cosa juzgada debido a que éstas fueron resueltas a través del primer pleito que presentaron los demandantes ante el tribunal federal. Dicha moción también fue notificada al licenciado Franco

Rivera. Luego de recibir la misma, el 12 de diciembre de 2001 éste les envió una carta a los demandantes con copia de dicha moción aconsejándoles que actuaran rápidamente llevando esta moción a su nuevo abogado para que pidiera tiempo para contestarla ya que entendía que carecía de mérito.

Luego de varios trámites e incidentes procesales, el 26 de diciembre de 2001, sin el beneficio de la comparecencia de los demandantes, el tribunal federal desestimó la demanda debido a lo resuelto en el primer caso radicado por los demandantes ante dicho foro y más importante aún por la apatía de los demandantes. Al así hacerlo destacó que era aparente que los demandantes habían perdido interés en su caso lo cual quedó evidenciado por su falta de oposición a la moción de los demandados aun cuando el tribunal les había dado una amplia oportunidad para comparecer.

Así las cosas, Vázquez Pedrosa —nuevamente con la ayuda de Ramos Peña— el 10 de enero de 2002 le envió una carta al licenciado Franco Rivera indicándole que estaba confundido con el contenido de la referida misiva debido a que desconocía que éste hubiera renunciado a su caso. A esos efectos, le expresó que había abandonado su caso negligentemente y sin tener la cortesía de informárselo. Asimismo, le señaló que había intentado sin éxito comunicarse con él a su oficina para aclarar el mensaje de la carta. Finalmente, exigió la devolución de los $1,500.

El 6 de febrero de 2002, el licenciado Franco Rivera le envió una carta a Vázquez Pedrosa expresándole que supuestamente en junio de 2001 le había enviado una carta notificándole que iba a renunciar al caso[15], que había decidido renunciar al caso debido a la decisión de Ramos Peña de no continuar trabajando en los casos laborales que él había referido a la oficina, y que la devolución del dinero era improcedente por todo el trabajo realizado en el caso, destacando que una facturación arrojaría tal vez un saldo a su favor.

En respuesta a dicha misiva, el 28 de febrero de 2002, Vázquez Pedrosa nuevamente envió una carta al licenciado Franco Rivera reiterando que deseaba el reembolso de su dinero, la entrega de su expediente, las copias de las deposiciones realizadas y evidencia de pago de los gastos para los cuales desembolsó dinero adicional.

Posteriormente, Vázquez Pedrosa logró comunicarse con la oficina del licenciado Franco Rivera donde le indicaron que las copias del expediente se tardarían un poco porque era voluminoso. Posteriormente, --luego de que lo llamaran a su casa informándole que estaban trabajando con el expediente-- Vázquez Pedrosa llamó nuevamente a dicha oficina y le notificaron que <u>el expediente estaba listo pero que tenía que recogerlo personalmente y cuando el</u>

---

[15] El Lcdo. Franco Rivera nunca presentó dicha carta como evidencia en el presente caso por lo cual presumimos que nunca existió.

licenciado Franco Rivera estuviera presente debido a que tenía que firmar un recibo.[16] No obstante lo anterior, Vázquez Pedrosa decidió que no iba a ir a recogerlo porque estaba molesto.

En virtud de los hechos anteriormente expuestos, el Comisionado Especial concluyó que el licenciado Franco Rivera había incurrido en las violaciones imputadas en la querella. A esos efectos, determinó que éste no desplegó la diligencia y responsabilidad requerida, ello en violación al Canon 18, ante al dejar en manos de un paralegal o consultor la defensa de su cliente. A su vez, --y aun cuando en sus determinaciones de hechos estableció que los demandantes estuvieron en todo momento informados de todas las etapas del proceso federal y estatal-- resolvió que el licenciado Franco Rivera violó el Canon 19, ante; que no cumplió con las exigencias del Canon 20, ante, al no tomar las medidas necesarias antes de renunciar a la representación legal para evitar un perjuicio a los derechos de su cliente destacando que fue tardía la gestión de enviarles una carta el 12 de

---

[16] En el entretanto y en respuesta de la misiva del 28 de febrero, el 12 de marzo de 2002, mediante otra carta, el Lcdo. Franco Rivera le reiteró a Vázquez Pedrosa que no había abandonado su caso sin notificárselo previamente, que no violó el contrato de honorarios teniendo derecho a dicha suma, que la mitad de dicho dinero pasó a manos de Ramos Peña por su trabajo inicial en el caso y que el expediente estaba a su disposición en su oficina por cita previa para así poder tener las copias individuales de todos los documentos del caso incluyendo las varias deposiciones que se tomaron.

diciembre de 2001, al no presentar un desglose de los servicios ni de los gastos incurridos en la defensa del querellante que justificara la retención de los $1,500 y al no entregar inmediatamente el expediente del caso, ello también en violación de una orden de este Tribunal.

Además de encontrar probados los cargos de la querella, el Comisionado Especial destacó que la controversia en el presente caso no se limitaba a la relación abogado-cliente entre Vázquez Pedrosa y el licenciado Franco Rivera con sus consecuentes responsabilidades, <u>sino que se centraba en la figura de un intermediario que por las labores que realizaba generó conflictos</u>. De este modo, estableció que el licenciado Franco Rivera también violó los Cánones 33 y 34 de los de Ética Profesional, 4 L.P.R.A Ap. IX, al entrar en un contrato de sociedad con Ramos Peña, quien no era abogado, para proporcionarse y tramitar sus casos, cobrando éste la mitad de sus honorarios profesionales.

Con el beneficio de los alegatos, presentados por el licenciado Franco Rivera y el Procurador General, procedemos a resolver la querella radicada.


II

Como es sabido, "[e]l día en que un abogado presta juramento ante el Tribunal Supremo le es concedido un gran privilegio: el de poder ejercer una profesión, honrosa por demás, que tiene una rica y extraordinaria tradición y que

desempeña un importante papel en nuestra sociedad". *In re* Quintero Alfaro, res. el 9 de febrero de 2004, 2004 T.S.P.R. 20. Al juramentar una persona como abogado, éste se convierte en funcionario del Tribunal y ministro ordenado de la justicia y se compromete a desempeñar su alto ministerio con la mayor y más excelsa competencia, compromiso e integridad. *In re* Quintero Alfaro, ante; Ramos Acevedo v. Tribunal Superior, 133 D.P.R. 599, 613-14 (1993).

No obstante, y como hemos señalado, este privilegio no está exento de responsabilidades; entre ellas, está la de desempeñar con lealtad los deberes que como abogados del Estado Libre Asociado de Puerto Rico les imponen la ley y el Código de Ética Profesional. *Ibid.* Particularmente, los Cánones de Ética Profesional constituyen un compromiso constante para con la sociedad puertorriqueña. Éstos "enuncian los deberes de respeto y profesionalismo que debe[n] caracterizar a todo jurista y letrado en el desempeño de su trabajo frente a sus clientes y colegas ante todo foro en que ejerza". *In re* Fernández de Ruiz, res. el 21 de abril de 2006, 2006 T.S.P.R. 73, *In re* Clavell Ruiz, 131 D.P.R. 500, 508 (1992). En virtud de lo anterior, es indispensable que todo abogado, al llevar a cabo sus funciones, cumpla celosamente con los referidos deberes, entre los cuales se encuentran las exigencias relacionadas con el descargo de los asuntos de encomendados por sus clientes. Véase *In re*

_Moreno Cortés_, res. el 20 de mayo de 2003, 2003 T.S.P.R. 91.

En lo aquí pertinente, el Canon 18 de los de Ética Profesional, ante, le impone al abogado el deber de rendir una labor idónea de competencia y diligencia en relación con los asuntos de su cliente. Específicamente, dicha obligación requiere que todos los miembros de la clase togada, al defender los intereses de su cliente, se desempeñen de manera capaz y diligente, desplegando en cada caso su más profundo saber y habilidad y actuando en aquella forma que la profesión jurídica en general estima adecuada y responsable. _In re Ortiz Morales_, res. el 8 de noviembre de 2005, 2005 T.S.P.R. 199; véanse, además, _In re Alonso Santiago_, res. el 13 de septiembre de 2005, 2005 T.S.P.R. 137; _In re Roldós Matos_, res. el 17 de marzo de 2004, 2004 T.S.P.R. 40; _In re Román Rodríguez_, 152 D.P.R. 520, 526 (2000); _In re Flores Ayffan_, 150 D.P.R. 907, 913 (2000); _In re Ortiz Velázquez_, 145 D.P.R. 308, 313 (1998); _In re Avilés Vega_, 141 D.P.R. 627, 632 (1996).

Conforme a lo anterior, este Tribunal ha reiterado que los abogados tienen el deber "de defender diligentemente los intereses de su cliente con un trato profesional caracterizado por la mayor capacidad, lealtad, responsabilidad, efectividad y la más completa honradez". _In re Alonso Santiago_, ante; véase, además, _In re Flores Ayffán_, ante, a la pág. 913; _In re Vélez Valentín_, 124 D.P.R 403, 408 (1989). Ello así toda vez que el aludido

Canon 18, ante, a su vez, establece que "[e]l abogado no podrá asumir una representación profesional cuando está consciente de que no puede rendir una labor idónea y competente y que no puede prepararse adecuadamente sin que ello apareje gastos o demoras a su cliente o a la administración de la justicia". *In re* Ortiz Morales, ante; véase, además, *In re* Román Rodríguez, ante, a la pág. 526. Así pues, una vez el abogado acepta y asume la representación legal de un cliente --irrespectivamente de las razones y motivaciones que tuvo para llevar el caso-- tiene la responsabilidad de descargar su labor con la requerida rapidez y eficiencia. *In re* Alonso Santiago, ante; *In re* Acosta Grubb, 119 D.P.R. 595, 603 (1987).

En virtud de lo anterior, hemos establecido que incurre en una seria violación al Canon 18 el jurista que, en el ejercicio de sus funciones, actúa con desidia, despreocupación, inacción, displicencia, no manteniendo al cliente informado del desarrollo del caso y permitiendo que la acción de éste sea desestimada por no desplegar toda su habilidad y capacidad en beneficio de su representado. *In re* Fernández de Ruiz, ante; *In re* Ortiz Velázquez, ante, a las págs. 313-314.

De otra parte, y cónsono con el antes mencionado deber, se encuentra el de mantener informado al cliente sobre todo asunto importante que surja en el trámite de su caso. A tales efectos, el Canon 19 de los de Ética Profesional le impone a todo abogado la obligación de

"mantener informado a su cliente de las gestiones realizadas y del desarrollo de los asuntos a su cargo, consultándole cualquier duda sobre asuntos que no caigan en el ámbito discrecional, y dentro de los medios permisibles, cumplir con sus instrucciones". *In re Acosta Grubb*, ante, a la pág. 603; véanse, además, *In re Ortiz Morales*, ante; *In re Laureano Molina*, res. el 13 de enero de 2004, 2004 T.S.P.R. 6; *In re Cardona Ubiñas*, res. el 15 de marzo de 2002, 2002 T.S.P.R. 48; *In re Román Rodríguez*, ante, a la pág. 527; *In re Ortiz Velázquez*, ante, a la pág. 313; *In re Avilés Vega*, ante, a la pág. 633. Es preciso señalar que los referidos deberes de diligencia e información se activan desde el momento mismo en que el abogado acepta tramitar las reclamaciones del cliente y continúan hasta que finaliza dicha representación legal.

Dicha relación, entre otras razones, puede terminar debido a la renuncia del abogado al caso, aun cuando el mismo no haya finalizado ante los tribunales. Para tal situación, el Canon 20 de los de Ética Profesional establece el procedimiento que debe seguir todo abogado que, habiendo representado a un litigante en el foro judicial, desea dar por terminada dicha representación. A tales efectos, el Canon 20, ante, establece que todo abogado que desea renunciar necesita obtener el permiso del tribunal para poder dar por terminada dicha relación, disponiéndose que debe solicitarlo solamente cuando exista una razón justificada e imprevista para ello. 4 L.P.R.A.

Ap. IX, C. 20. Hasta tanto el abogado no sea formalmente relevado de sus funciones, aceptando el tribunal su renuncia, éste tiene el deber de continuar llevando a cabo su gestión profesional de forma competente y diligente. Lluch *et al.* v. España Service Station, 117 D.P.R. 729, 752 (1986).

Dicho Canon 20, ante, dispone que antes de renunciar el abogado debe tomar ciertas medidas razonables para evitar perjuicios a los derechos de sus clientes. En específico, se dispone que el abogado debe: (1) notificar su decisión de renunciar al cliente; (2) aconsejarle debidamente sobre la necesidad de una nueva representación legal cuando ello sea necesario; (3) concederle tiempo para conseguir una nueva representación profesional; (4) aconsejar sobre la fecha límite de cualquier término de ley que pueda afectar su causa de acción o con relación a la radicación de cualquier escrito que le pueda favorecer; y (5) el cumplimiento de cualquier otra disposición legal del Tribunal al respecto, incluyendo la notificación al tribunal de la última dirección conocida de su representado. *In re* Laureano Molina, ante; véanse, además, *In re* Ortiz Morales, ante; *In re* Román Rodríguez, ante, a la pág. 526.

El Canon 20, además, establece qué debe hacer todo letrado luego de que el tribunal haya aceptado su renuncia y sea efectiva la misma. A esos efectos, establece que el abogado tiene el deber de hacerle entrega al cliente de su

expediente y de todo documento relacionado con el caso.
Véase: *In re Irrizary Vega*, 151 D.P.R. 916, 922 (2000);
véase, además, *In re Ortiz Morales*, ante. Conforme a lo
anterior, hemos enfatizado que "cuando un cliente lo
solicite, debe entregársele el expediente y todo documento
relacionado con el caso de inmediato y sin dilación
alguna". *In re Irrizary Vega*, ante, a la pág. 922; *In re
Román Rodríguez*, ante, a la pág. 528; *In re Avilés Vega*,
ante, a la pág. 633. Ello en vista de que, conforme a
nuestro ordenamiento, los abogados no tienen derecho de
retención sobre los documentos del cliente. *In re
Rodríguez Mercado*, res. el 15 de septiembre de 2005, 2005
T.S.P.R. 144; *In re Irrizary Vega*, ante, a la pág. 922; *In
re Avilés Vega*, ante, a la pág. 633; Nassar Risek v.
Hernández, 123 D.P.R 360, 368 (1989); *In re Vélez*, 103
D.P.R. 590, 599 (1975). Aun cuando éstos no hubiesen
pagado sus honorarios. *Ibid.*[17]

III

Por estar íntimamente relacionados entre sí,
analizamos en conjunto el primer, tercer y cuarto cargo
imputado en la querella. Un examen sereno y sosegado del
expediente del presente caso nos lleva a la conclusión de

---

[17] A su vez, el referido Canon 20, ante, requiere que todo
abogado reembolse inmediatamente cualquier cantidad
adelantada que le hubiese sido pagada en honorarios por
servicios que no fueron prestados. 4 L.P.R.A. Ap. IX, C.
20 *In re Ortiz Morales*, ante.

que el licenciado Franco Rivera incurrió en violaciones a los Cánones 18, 19 y 20 al no ejercer su profesión con la diligencia, habilidad y responsabilidad que exigen dichos Cánones.

Surge del expediente ante nos que, al menos en una ocasión, el querellado, aun cuando solicitó una prórroga para ello, no radicó oposición alguna a una moción de sentencia sumaria presentada por la parte contraria ante el foro federal. Sin duda, al así actuar no rindió una labor idónea de competencia y diligencia. Aun cuando los Cánones de Ética no requieren que los abogados comparezcan frívolamente al tribunal, el licenciado Franco Rivera debió al menos hacer algún intento por defender los intereses de sus clientes para evitar que se dictara una sentencia sumaria en su contra.

De otra parte, al renunciar al caso de Vázquez Pedrosa y los otros demandantes, meramente le indicó a Ramos Peña que le comunicara a los demandantes su intención de renunciar, <u>sin reunirse con ellos y sin enviarles una carta para explicarles las consecuencias de lo anterior</u>. Aun cuando durante este proceso el querellado alegó que les envió una carta a sus representados para notificarles su decisión, en ningún momento presentó copia de la misma durante este proceso por lo cual presumimos que dicha carta nunca existió. Al así proceder incumplió con los deberes impuestos por los Cánones 18, 19 y 20, ante.

Empeora la situación el hecho de que, además de no haberle notificado su renuncia, el licenciado Franco Rivera tampoco tomó las medidas necesarias para no dejar a Vázquez Pedrosa y a los otros demandantes en un estado de indefensión. Éste no les aconsejó sobre la necesidad de conseguir una nueva representación legal ni les concedió un período razonable para conseguir un nuevo abogado. Peor aún no les hizo entrega del expediente de su caso para que éstos pudieran continuar los trámites de su caso asistidos por otro abogado.

Agrava aun más la situación el que dicho abogado desobedeció, sin justificación alguna, varios requerimientos del Procurador General y una orden de este Tribunal a esos efectos, lo cual como hemos reiterado constituye una falta ética separada e independiente de los méritos de la querella. *In re* Vargas Soto, 146 D.P.R. 55, 61 (1996).

IV

De otra parte, se le imputa al licenciado Franco Rivera haber retenido los $1,500 que le fueron entregados por Vázquez Pedrosa, como "retainer fee", sin realizar desglose alguno de los servicios y los gastos en que incurrió en la defensa de su caso que justificara dicha retención.

Como es sabido, el contrato de servicios profesionales de abogado se considera una variante del

contrato de arrendamiento de servicios. Sin embargo, por estar revestido de un alto contenido ético, este Tribunal lo ha descrito como un contrato *sui generis*. *In re Rodríguez Mercado*, ante citando a Nassar Risek v. Hernández, 123 D.P.R. 360 (1989); véanse, además, Méndez de Rodríguez v. Morales Molina, 142 D.P.R. 26, 33 (1996); Ramírez, Segal & Látimer v. Rojo Rigual, 123 D.P.R. 161, 172 (1989); véase, además, Sarah Torres Peralta, El Derecho Notarial Puertorriqueño, Edición Especial 1995, Publicaciones STP, Inc. San Juan, Puerto Rico, pág. 4.43. De este modo, y "[c]omo consecuencia de su naturaleza *sui generis*, la relación de abogado y cliente se encuentra inexorablemente ligada a los Cánones de Ética Profesional". Pérez Marrero v. Colegio de Dentista de P.R., 131 D.P.R. 545, 552-553 (1992).

Conforme a lo anterior, al iniciar una gestión profesional, todo jurista debe tener presente el Canon 24 de Ética profesional, 4 L.P.R.A. Ap. IX, C. 24; ello en vista de que éste regula el ámbito y las normas generales que rigen la fijación de honorarios de abogado. *In re Rodríguez Mercado*, ante; Pérez v. Colegio de Dentistas de P.R., ante, esc. 7; véase, además, Sarah Torres Peralta, *op. cit.,* a la pág. 4.38. A esos efectos, el Canon 24 de Ética Profesional, ante, --destacando que la profesión legal no es un mero negocio con fines de lucro sino que es parte de la administración de la justicia-- establece cuáles son los factores que deben ser tomados en

consideración al fijarse los honorarios. 4 L.P.R.A. Ap. IX. C. 24; véase Méndez de Rodríguez v. Morales Molina, 142 D.P.R. 26, 33 (1996). Entre los referidos factores, se encuentran los siguientes: "la cuantía involucrada en el litigio; los beneficios que derivará el cliente de los servicios del abogado; la habilidad que requiere conducir el caso adecuadamente; la contingencia de la compensación, y la dificultad y complejidad de las cuestiones planteadas". Ramírez, Segal & Látimer v. Rojo Rigual, ante, a la pág. 172.

De igual forma, el referido Canon 24 establece que --aun cuando los contratos verbales no están prohibidos-- es deseable que el acuerdo o pacto sobre los honorarios a ser cobrados sea reducido a escrito. *Ibid*. Hemos señalado que, de este modo, se evitan controversias con los clientes sobre la compensación por los servicios prestados. Nassar Risek v. Hernández, ante, a la pág. 373. A tales efectos, este Tribunal ha resuelto que en aquellos casos en que no sea anticipable de un todo, al inicio de la gestión profesional, la extensión y valor de los honorarios, el abogado deberá reducir a escrito el acuerdo con la mayor claridad en sus términos, libre de ambigüedades y haciendo constar las contingencias previsibles que pudieran surgir durante el transcurso del pleito o del asunto que se atiende a nombre del cliente. *In re* Rodríguez Mercado, ante citando a Pérez v. Col. Cirujanos Dentistas de P.R., 132 D.P.R. 545 (1992);

Ramírez, Segal & Látimer v. Rojo Rigual, ante; Colón v. All AMER. Life & Cas. Co., ante.

Particularmente, en cuanto a los honorarios contingentes, este Tribunal ha establecido que no están reñidos con la ética siempre y cuando sean beneficiosos al cliente o cuando éste los prefiera luego de que el abogado le explique con claridad sus consecuencias. Méndez de Rodríguez v. Morales Molina, ante, a la pág. 33; Pérez v. Colegio de Dentistas de P.R., ante, a la pág. 555; Sarah Torres Peralta, *op. cit.*, a la pág. 4.45. No obstante lo anterior, y para minimizar el riesgo de que surjan controversias futuras entre un abogado y su cliente, hemos recomendado, como indicamos anteriormente, que se consignen por escrito las contingencias previsibles que pudieran surgir durante el transcurso del pleito. Méndez de Rodríguez v. Morales Molina, ante, a las págs. 34-35; Ramírez, Segal & Látimer v. Rojo Rigual, ante, a las págs. 171-172; Pérez v. Colegio de Dentistas de P.R., ante, a la pág. 554.

De otro lado, el abogado tiene derecho a recibir una compensación razonable por los servicios que rinde a sus clientes. *In re* Rodríguez Mercado, ante citando a Pérez v. Col. Cirujanos Dentistas, ante, a la pág. 554. Así pues, "en ausencia de un pacto expreso sobre la cuantía que debe ser cobrada por lo servicios profesionales, aplica el Artículo 1473 del Código Civil, 31 L.P.R.A. § 4111, que establece, en lo aquí pertinente:

> …En cuanto a los servicios profesionales, se
> estará, para la remuneración de los mismos, lo
> convenido entre las partes; cuando no hubiere
> convenio y surgieren diferencias, la parte con
> derecho a la remuneración podrá reclamar y
> obtener en juicio de la otra parte,...el importe
> razonable de dichos servicios.

Conforme a la referida disposición estatutaria, en nuestro ordenamiento jurídico se reconoce la máxima legal *quantum meruit* que significa:"[t]anto como se merece"; es el derecho a reclamar el valor razonable de los servicios prestados. *In re* Rodríguez Mercado, ante, citando a I. Rivera García, Diccionario de Términos Jurídicos, 2da. Ed. Rev. New Hamphire, Ed. Equito Publishing Corp., pág. 4; Méndez de Rodríguez v. Morales Molina, ante, a la pág. 33; Pérez v. Colegio de Dentistas de P.R., ante, a las págs. 557-558.

Ahora bien, además de las exigencias del Canon 24 de los de Ética Profesional, ante, y del derecho de los abogados a recibir una compensación razonable por sus servicios, existen unas limitaciones estatutarias respecto a la fijación de honorarios profesionales. En lo aquí pertinente, entre las limitaciones legales establecidas para el cobro de honorarios se encuentra la prohibición de llevar a cabo pactos sobre honorarios con trabajadores o empleados que se ven en la necesidad de reclamar contra sus patronos al amparo de leyes laborales estatales o federales. Art. 1 de la Ley Núm. 402 del 12 de mayo de 1950, 32 L.P.R.A. § 3114; véase, además, Belk Arce v.

Martínez, res. el de de 2004, 2004 T.S.P.R. 167; López

Vicil v. ITT Intermedia, Inc., 142 D.P.R. 857, 868 (1997).

En tales reclamaciones laborales, si el empleado es

exitoso, es el patrono quien paga los honorarios del

abogado y no el empleado. Belk Arce v. Martínez, ante;

López Vicil v. ITT Intermedia, Inc., ante. [18]

La Asamblea Legislativa estableció dicha prohibición

a través de la Ley Núm. 402 del 12 de mayo de 1950, según

enmendada, 32 L.P.R.A. § 3114 *et seq.*, toda vez que los

contratos a base de porcentajes en esos casos redundan en

detrimento de la paz industrial. Art. 1, Ley Núm. 402,

ante, 32 L.P.R.A § 3114. Mediante la referida pieza

legislativa expresamente se estableció que son "nulos y

contrarios al orden público todos los contratos, convenios

o acuerdos en que trabajadores o empleados se obliguen

---

[18] Es de notar que con respecto a los honorarios de abogado al amparo de la Ley Núm. 100, ante, y la Ley Núm. 80, ante, se dispone que si el empleado es exitoso el tribunal impondrá una suma en concepto de honorarios de abogado que tendrá que pagar el patrono. Art. 4 de la Ley Núm. 100, ante, y Art. 11 de la Ley Núm. 80, respectivamente; véase, además, López Vicil v. ITT Intermedia, Inc., ante, a la pág. 869. En los casos basados en la Ley Núm. 100 el tribunal le concederá como norma general al abogado del trabajador victorioso una suma equivalente al veinticinco por ciento (25%) de la indemnización base concedida al empleado. Si el abogado considera que por el esfuerzo realizado en el caos se justifica recibir una cantidad mayor de honorarios deberá presentar un memorando para que el tribunal evalúe si en se deben fijar la cuantía de honorarios a base las horas trabajadas y no a base del por ciento antes indicado. *Ibid*. De otra parte, en casos al amparo de la Ley Núm. 80, ante, se establece que el tribunal fijará honorarios en una cantidad que no será inferior al 15% del total de la compensación recibida por el trabajador o cien (100) dólares lo que fuera mayor. 29 L.P.R.A. § 185k.

directa o indirectamente a pagar honorarios a sus abogados en casos de reclamaciones judiciales o extrajudiciales contra sus patronos bajo la legislación laboral de Puerto Rico o bajo la legislación laboral del Congreso de Estados Unidos aplicable a Puerto Rico, o al amparo de un convenio de naturaleza individual o colectivo". Art. 3, Ley Núm. 402, ante, 32 L.P.R.A. § 3116; López Vicil v. ITT Intermedia, Inc., ante, a la pág. 869. Se establece que todo abogado que reciba compensación de un obrero, o grupo de obreros, vendrá obligado no sólo a reembolsarle al obrero o grupo de obreros la cantidad que le haya sido pagada, sino además vendrá obligado a pagarle una suma igual de dinero, en concepto de daños líquidos. Art. 4, Ley Núm. 402, ante, 32 L.P.R.A. § 3117.

En el presente caso no está en controversia el hecho de que el licenciado Franco Rivera suscribió por escrito un contrato de servicios profesionales con Vázquez Pedrosa. En el cual se hizo constar que la naturaleza del caso era "[v]iolación a Ley de Derecho Civiles por discrimen en el trabajo y a otras leyes laborales tanto federales como estatales". Además, surge de dicho contrato que las partes acordaron una cláusula especial de honorarios a los efectos de que el querellado cobraría un

33% de la suma que en su día se recuperara por el pleito y $1,500 de "retainer fee".[19]

Siendo el caso de Vázquez Pedrosa una reclamación laboral, por despido injustificado y violaciones al convenio colectivo al amparo de leyes tanto federales como estatales, el licenciado Franco Rivera <u>no</u> podía cobrar suma alguna de dinero en concepto de honorarios profesionales por dicha representación. Al actuar de ese modo, incumplió con una prohibición claramente establecida por ley. Siendo ello así, el contrato suscrito entre él y Vázquez Pedrosa es nulo y él está obligado a devolver los $1,500 que recibió de Vázquez Pedrosa como anticipo de sus honorarios más una suma igual en concepto de daños líquidos.

V

Por último, el Comisionado Especial le imputa al licenciado Franco Rivera haber violado el Canon 33 de los de Ética Profesional, ante, al entrar en un negocio de sociedad para tramitar sus casos con Ramos Peña, quien no era abogado, pagándole la mitad de los honorarios que recibía por los servicios prestados. De igual forma, le imputa haber violado el Canon 34 de Ética Profesional,

---

[19] Es de notar que en el presente caso específicamente se pagó la suma de $1,500 como "retainer fee" como parte de los honorarios del abogado y no como gastos.

ante, al haberse proporcionado casos a través de Ramos Peña como su intermediario.

Con respecto a dichas determinaciones el licenciado Franco Rivera aduce que no incurrió en conducta violatoria de dichos Cánones debido a que en ningún momento permitió que Ramos Peña ejerciera labores propias de un abogado; que en todo momento éste trabajó bajo su supervisión y en función de sus instrucciones; que todos los clientes tenían conocimiento de que Ramos Peña no era abogado sino su asistente; y que él nunca permitió que él compareciera a vistas al Tribunal representando falsamente que era abogado. A su vez, sostiene que el trabajo de Ramos Peña --según surge del contrato de servicios profesionales suscrito entre ambos-- era únicamente uno de asistencia, sin obligación alguna de proveer o referir casos a su oficina y sin establecerse cuota alguna de casos que tenía que referir.

En específico y en lo aquí pertinente, el Canon 33 de Ética Profesional, ante, "impone al abogado la obligación de evitar la práctica de la abogacía y la notaría por individuos no autorizados". *In re* Gervitz Carbonnel, res. el 28 de julio de 2004, 2004 T.S.P.R. 141. De este modo, el Canon 33 establece varias actuaciones prohibidas a todo abogado justificadas "no como un medio para eliminar la competencia en la profesión legal, sino como un ejercicio del poder de estado para la protección del público de personas no cualificadas o no diestras". *Ibid*.

Así pues, el referido Canon 33 prohíbe que un abogado permita o facilite a una persona o entidad que no esté autorizada a ejercer la abogacía en nuestra jurisdicción que cobre total o parcialmente por los servicios profesionales o notariales prestados por el abogado; que permita que personas no autorizadas a ejercer la profesión de abogado en Puerto Rico suministren cualquier clase de consejo legal a clientes del abogado o de la firma legal aun cuando para ello dichas personas no tengan que comparecer a los tribunales[20]; y que se una en sociedad con una persona que no ha sido autorizada a ejercer la abogacía cuando cualquiera de las actividades de la sociedad envuelva la práctica de la abogacía. 4 L.P.R.A. Ap. IX, C. 33.

Por otra parte, el Canon 34 de los de Ética Profesional, ante, reglamenta lo relativo a la instigación o gestión de pleitos. A esos efectos, el Canon 34, ante, obliga a todo abogado a abstenerse de ofrecer, sin ser requerido, su consejo o asesoramiento legal a clientes potenciales para iniciar reclamaciones judiciales, ya sea directamente o a través de intermediarios. Véase: *In re Gervitz Carbonnel*, ante; véase, además, *In re* Izquierdo Stella, 154 D.P.R. 732, 733-734 (2001); *In re* de la Cruz

---

[20] Es preciso señalar que lo anterior "no impide que el abogado o la firma legal se asesore con una persona no autorizada a ejercer la abogacía en Puerto Rico para prestar un mejor servicio a cliente". 4 L.P.R.A. Ap. IX, C. 33.

Ríos, 147 D.P.R. 140, 141 (1998). De este modo, se prohíbe "la solicitación de clientes de forma personal o a través de intermediarios". *Ibid.*

Con respecto a la referida disposición estatutaria, este Tribunal ha establecido que "[s]u adopción responde, en parte, a la antipatía que tradicionalmente ha mostrado la profesión hacia la instigación de pleitos judiciales por parte de abogados cuya exclusiva motivación es de índole pecuniaria" y, asimismo, "a la antipatía que generan las actuaciones de abogados encaminadas a gestionar su contratación en momentos en que los clientes potenciales se encuentran en una situación angustiosa o de debilidad emocional". *In re* Izquierdo Stella, ante, a las págs. 738-739 citando a *In re* Franco Rivera y Masini Soler, 134 D.P.R. 823 (1993); véase, además, *In re* Gervitz Carbonnel, ante.[21]

No sólo incurre en conducta violatoria del Canon 33 aquel abogado que permita que una persona ejerza ilegalmente la abogacía sino que claramente viola dicho Canon aquel jurista que comparte sus honorarios con una persona que no es abogado. Eso fue precisamente lo que

---

[21] De igual forma, hemos señalado que subyace en el texto de dicho Canon "la noción de que la contratación de un abogado debe ser realizada por un cliente de forma libera y voluntaria, sin que éste tenga que ser persuadido mediante promesas de éxito o presiones indebidas. Tal contratación debe surgir del genuino convencimiento del cliente de que su reclamación será atendida por el abogado seleccionado de forma diligente". *In re* Izquierdo Stella, ante, a la pág. 739.

ocurrió en este caso. Surge del contrato de servicios profesionales pactado entre ambos, que el licenciado Franco Rivera expresamente acordó que Ramos Peña recibiría una suma equivalente al cincuenta por ciento de sus honorarios en las correspondientes disposiciones finales de los casos que éste trabajara y del "retainer fee" que se le solicitara a los clientes. Fue justamente éste método de remuneración lo que generó un conflicto entre ambos que culminó en la renuncia del querellado al caso de Vázquez Pedrosa y de los demás demandantes. Siendo esto así concluimos que el licenciado Franco Rivera al compartir sus honorarios profesionales con Ramos Peña violó el Canon 33 de los de Ética Profesional, ante.

Igual conclusión se impone respecto a la violación al Canon 34. Somos del criterio que los hechos del presente caso, y la prueba que obra en el expediente, son suficientes para establecer que el licenciado Franco Rivera violentó las disposiciones del referido Canon. No hay duda que el caso de Vázquez Pedrosa llegó a la oficina del querellado referido por Ramos Peña, lo cual es suficiente como prueba clara, robusta y convincente, para concluir que el licenciado Franco Rivera tenía un acuerdo con éste para proporcionarse casos.

VI

Por los fundamentos anteriormente expuestos, resolvemos que el licenciado Franco Rivera incumplió con

los deberes que emanan de los Cánones 18, 19, 20, 33 y 34 de los Cánones de Ética Profesional y, a su vez, incumplió con la prohibición estatutaria de no cobrar honorarios profesionales a trabajadores cuando están envueltas reclamaciones laborales. Tomando en consideración que anteriormente este Tribunal tomó acción disciplinaria contra dicho letrado[22], consideramos procedente suspenderlo del ejercicio de la abogacía y de la notaría en nuestra jurisdicción por un período de tres (3) años.

Habiendo cobrado honorarios en violación a la antes mencionada prohibición, se instruye a José R. Franco Rivera para que, de manera inmediata, proceda a devolverle a Vázquez Pedrosa la suma de $1,500 y a pagarle una suma equivalente en concepto de daños líquidos, luego de lo cual deberá acreditarnos ese hecho mediante escrito al efecto.

Se dictará Sentencia de conformidad.

---

[22] En específico, anteriormente suspendimos al Lcdo. Franco Rivera del ejercicio de la profesión por seis (6) meses por incurrir en violaciones al Canon 35 de los de Ética Profesional, 4 L.P.R.A. AP. IX, C.35.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re*

José R. Franco Rivera

CP-2003-13

SENTENCIA

San Juan, Puerto Rico, a 16 de octubre de 2006

Por los fundamentos expuestos en la Opinión Per Curiam que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia decretando la suspensión inmediata de José R. Franco Rivera del ejercicio de la abogacía y de la notaría en nuestra jurisdicción por un período de tres (3) años.

Habiendo Franco Rivera cobrado honorarios en violación a la antes mencionada prohibición, se le instruye para que, de manera inmediata, proceda a devolverle a José L. Vázquez Pedrosa la suma de $1,500 y a pagarle una suma equivalente en concepto de daños líquidos, luego de lo cual deberá acreditarnos ese hecho mediante escrito al efecto.

Le imponemos a éste el deber de notificar a todos sus clientes de su inhabilidad de seguir representándolos e informar oportunamente de su suspensión a los foros judiciales y administrativos del País. Deberá certificarnos, además, dentro del término de treinta (30) días, el cumplimiento de estos deberes, notificando también al Procurador General.

La Oficina del Alguacil de este Tribunal procederá, de inmediato, a incautarse de la obra y

sello notarial de José R. Franco Rivera, luego de lo cual la entregará a la Oficina de Inspección de Notarías para el examen y correspondiente informe a este Tribunal.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton concurrió en el resultado sin opinión escrita. El Juez Asociado señor Rivera Pérez no intervino.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo